JESUS LOPEZ
CORRECTIONAL TRAINING FACILITY
D-37180  BW-201-LOW
P.O. Box 689
Soledad, CA 93960-0689
Pro Se



FILED

APR 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| JESUS LOPEZ, | ) | Case No._____ |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) | **EXHIBITS FOR PETITIONER'S** |
| v. | ) | **PETITION FOR WRIT OF HABEAS CORPUS.** |
|  | ) |  |
| BEN CURRY, Warden (A), et al., | ) | (Bound, Submitted and Lodged Separately) |
|  | ) |  |
| Respondent. | ) |  |

**PETITIONER'S EXHIBITS FOR HIS PETITION FOR WRIT OF HABEAS CORPUS**
(BOUND, SUBMITTED AND LODGED SEPARATELY)

**TABLE OF CONTENTS**

**EXHIBITS**

    "I"    CALIFORNIA COURT OF APPEALS, 1ST DISTRICT DECISIONS.

    "II"   SUBSEQUENT PAROLE CONSIDERATION HEARING [held 08/10/2006] TRANSCRIPTS.

    "III"  LETTER'S TO CALIFORNIA GOVERNOR REQUESTING HIM TO GRANT PAROLE.

    "IV"   CALIFORNIA GOVERNOR'S REVERSAL OF PETITIONER'S GRANT OF PAROLE.

**V SECTIONS**

        "A"   CALIFORNIA COURT OF APPEALS, 1ST DISTRICT'S PEREMPTORY WRIT OF
            MANDATE ISSUED TO THE CALIFORNIA SUPERIOR COURT.

        "B"   CALIFORNIA SUPERIOR COURT, COUNTY OF SAN FRANCISCO'S DECISION
            DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS.

# EXHIBIT

## "I"

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

FILED
Court of Appeal First Appellate District

DEC 17 2007

Diana Herbert, Clerk
By_____Deputy Clerk

In re JESUS LOPEZ,

    on Habeas Corpus.

A119885

(San Francisco County
Super. Ct. Writ No. 5495)

THE COURT:[*]

    The petition for a writ of habeas corpus is denied.

SIGGINS, J.

Dated:   **DEC 17 2007**  _____   _____ J.

---

[*] Siggins, J. & Horner, J. (Judge of the Alameda Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), participating. Pollak, J. dissents from the decision to summarily deny the petition.

**POLLAK, J.**—Dissenting.

This is yet another case the ultimate outcome of which is dependent on resolution of the proper standard of review, an issue now pending before our Supreme Court. (*In re Lawrence* (2007) 150 Cal.App.4th 1511, review granted Sept. 19, 2007, S154018.) As I have written in previous dissents, if no more is required to uphold the denial of parole than some evidence that the petitioner committed a horrible crime—i.e., one "in an especially heinous, atrocious, or cruel manner" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1))—it may be that the Governor's decision to overturn the finding of suitability for parole can be upheld.[1] If that is the standard, petitioner can be denied parole forever for the crime he committed more than 24 years ago, despite his subsequent undisputed salutory efforts at personal improvement and the exceptionally low risk of recidivism he presents ("the lowest level that can reasonably be estimated" in the words of one psychological assessment [petn. exh. II, p. 59]). However, if, as a growing number of cases have held, what is required is some competent evidence tending rationally to show that he "will pose an unreasonable risk of danger to society if released from prison" (Cal. Code Regs., tit. 15, § 2402, subd. (a)), the finding of unsuitability clearly cannot be sustained.[2] (E.g., *In re Dannenberg* (2007) 156 Cal.App.4th 1387; *In re Barker* (2007)

---

[1] Even that is debatable, since the Governor's explanation for his decision reflects a misunderstanding of the facts of the crime. The Governor indicated the crime was "especially grave" in part because it involved multiple victims and shooting both of them multiple times. In fact, while petitioner did shoot a single victim four times, the record reflects that the second "victim" was a bystander inadvertently struck by a ricocheting fragment from one of the shots.

[2] The words of the presiding commissioner of the Board of Parole Hearings explaining the Board's finding of suitability bear repetition: "[Y]ou had no juvenile record of assaulting others, that you had a stable social history exhibited by reasonably stable relationships with others. You came from an intact family, large family in Mexico. But while in prison, you've enhanced your ability to function within the law through participation in education programs and the Panel noted that although you had a high school diploma from Mexico you took advantage of the opportunity here and achieved a GED while incarcerated. That you've participated in self-help programs. The Panel noted and to your credit that you've not only done one program with respect to the alcohol issues, that you've actually done three in a long sustained manner. And that included the 12-Step program and multiple other AA programs occurring on different nights of the week. So far as your vocational programs, you did get the vocational certificate in auto mechanics and you also have had institutional job assignments that will provide you

151 Cal.App.4th 346, 366; *In re Weider* (2006) 145 Cal.App.4th 570, 589; *In re Scott* (2005) 133 Cal.App.4th 573, 595.) What the Sixth Appellate District said in overturning the Governor's denial of parole in *In re Dannenberg*, is equally applicable to the petitioner here: "It is not the mere passage of time that deprives [petitioner's] commitment offense of predictive value with respect to the risk he may pose to society.

---

opportunities for marketable skills upon your parole. . . . The Panel noted that the offense could have been committed as a result of significant stress in your life and the indication was that there was a life threatening knife attack that you had previously suffered, that you lacked a significant criminal history of violent crime. This essentially was your only crime. . . . Because of your maturation, growth and a greater understanding and your advanced age the probability of recidivism is reduced. . . . You've got realistic parole plans. They include a job offer and family support. . . . We also noted that you've got substantial support by virtue of letters. . . . That you've maintained positive institutional behavior, which indicates a significant improvement in self-control, and to your credit you have only one 115. That was in 1988 and it was for the offense of not wearing earphones with your radio. . . . That you've shown signs of remorse, that you indicate you understand the nature and magnitude of the offense. You've accepted responsibility for your criminal behavior and you've demonstrated a desire to change toward good citizenship. These demonstrations have occurred in the evaluations that have been done by the psychologists, the comments that have been made in the Board reports and the comments that were made at today's hearing. . . . The Panel considered two psychological exams. The first one being September of 2003 by Dr. Reed. Dr. Reed concludes in one portion of the report that you appear genuinely remorseful for your crime. You understand fully the damage that was done to the victim and the family and you appear to be fully aware how your anger, fearfulness and . . . in a potentially dangerous situation and possession of a handgun and being under the influence of alcohol, those were all factors that led to the death of the victim and . . . you do appear genuinely penitent for the crime. The doctor also concluded in the same report that if released to the community that your violence potential was considered to be low and in parentheses he indicates the lowest level that can be reasonably estimated. And also that one of the other observations is that you're competent and responsible for your behavior and that you have the ability to abide by institutional standards and you've done so during your incarceration. We also considered a report that was done in February of 2000 by Dr. Pesavento [which] indicates that your violence potential outside a controlled setting in the past is considered to be average and at the present is estimated to be decreased. If released to the community, you in all probability—be likely to continue the improvement given your defined set of personal expectations and goals. And also the doctor noted even at that time that you appear to have matured and taken complete responsibility for your actions and that you've become an independent thinker and appear to have learned from your previous mistakes." (Petn. exh. II, pp. 55-59.)

The Governor noted all these positive factors and disagreed with none of them. Nonetheless, he concluded, "The gravity of the second-degree murder committed by Jesus Lopez is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk." (Petn., exh. IV, p. 3.)

The quantity and quality of [petitioner's] consistent and spotless record of upstanding conduct for the last 20 years, coupled with the absence of any negative factors and the presence of every conceivable favorable factor, combine to eliminate any modicum of predictive value that his commitment offense once had. The record before the Board . . . lacks any support for the . . . conclusion that, due to the nature of his commitment offense, [petitioner] poses a current, unreasonable risk of danger to society if released." (*In re Dannenberg, supra,* at p. 1401.)

In my view, these latter cases reflect the correct standard. There is absolutely no evidence that petitioner presents a significant risk of reoffending and he is therefore entitled to be released on parole.

        Pollak, Acting P. J.

4

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

FILED

Court of Appeal First Appellate District

**JUN 2 9 2006**

Diana Herbert, Clerk

By_____ Deputy Clerk

| | |
|---|---|
| In re JESUS LOPEZ., <br><br> on Habeas Corpus. | A113836 <br><br> (San Francisco County <br> Super. Ct. Writ No. 5325) |

BY THE COURT:[*]

The petition for a writ of habeas corpus is denied.

Dated:   JUN 2 9 2006          **McGUINESS,**   P.J.
_____          _____

[*] McGuiness, P.J. and Parrilli, J. concur in the decision.  Pollak, J. dissents.

1

Pollak, J., dissenting.

I would grant an alternative writ. This is yet another case in which the Board of Parole Hearings, formerly the Board of Prison Terms (the Board), has found an inmate serving an indeterminate life sentence for second degree murder to be unsuitable for parole based solely on the immutable circumstances of the underlying offense, giving nothing but lip service to every other criteria that the governing regulations require the Board to consider. (Cal. Code Regs., tit. 15, § 2402.)[1]

Defendant began his prison term in August 1986 and first became eligible for parole in May 1996. Despite the absence of a criminal record other than the single committing offense,[2] unquestioned remorse, an exemplary prison record, successful long-term participation in Alcoholics Anonymous and anger management courses, a supportive family and prospective employment in Mexico, where he certainly will be deported, and a psychological evaluation that he presents a below average risk of further violence and "can function well on his own and become a productive member of society" (Exh. A, p. 44), the Board has once again found him unsuitable for parole. According to the presiding commissioner, the denial of parole "really is based almost entirely on the commitment offense. . . . Mr. Lopez does not have a significant criminal history. And he has been programming well. He's had only one 115 disciplinary report during his entire incarceration . . . your counselor's reports, your psyche evaluations are . . . favorable and he does have parole plans in Mexico. Once again, Mr. Lopez, this is a . . . denial that's really based on the crime." (*Id.* at pp. 64-65.)

---

[1]  All references to regulations are to California Code of Regulations, title 15, section 2402.

[2]  As a result of the single shooting episode, defendant was convicted both of murdering the intended victim, and of assault with a firearm upon a bystander injured by a ricocheting bullet.

What were the circumstances indicating that the commitment offense was committed "in an especially heinous, atrocious or cruel manner" (regs., subd. (c)(1))? In a drunken argument, defendant retrieved a gun from his car and ultimately shot the intended victim four times, the final shots after the victim had fallen to the ground. According to defendant, whose description of events is nowhere contradicted or questioned, "we were speaking about willing [killing?] each other like what are you looking at me and he's looking at me and we start talking that way and we, we start speaking about our mothers. And I was so intoxicated, I was so drunk and I cannot overcome that kind of conversation. So finally I just, I told him, you know, hey, what happened, why you talk to me that way and . . . I was bringing the gun in thinking to talk, talking to him again to see if he, we, we make him – . . . . I ask him – he say you have not the balls you son of a bitch. You, you, and then his friends started, started to surrounding me. And one of them or I see someone to went over there and locked the door. So I got scared so, very scared so. . . . So I start shoot. I don't know how many shots I took. I don't know how much time I stand up right there, so until my friend comes and scream my name, 'Jesus, what do you do? Let's go, let's go.' And I just wake up like I wake up." (*Id.* at pp. 15-17.) In the words of the presiding commissioner, "This was a very, this was a callous offense. This was a situation where Mr. Lopez could have easily left, he was in no danger." (Exh. A, p. 65.)

The issue, of course, is not whether defendant was justified in shooting the victim, but whether the circumstances of the crime provide any rational indication that defendant "will pose an unreasonable risk of danger to society if released from prison." (Regs., subd. (a).) While "a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' . . . [citation], [this] proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of

3

subsequent circumstances' may be unfair [citation], and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] *The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.*" (*In re Scott* (2005) 133 Cal.App.4th 573, 594-595, fns. omitted, italics added; see also, e.g., *In re Scott* (2004) 119 Cal.App.4th 871, 891; *In re Smith* (2003) 114 Cal.App.4th 343, 366-367.) Nowhere in this record is there any *evidence* or rational explanation drawn from the circumstances of his crime indicating a reason to believe that this defendant will pose an unreasonable risk to public safety if released. To the contrary, the record reflects, and the Board acknowledged, that defendant has successfully addressed the underlying issues of alcohol abuse and uncontrolled anger that led to his offense.

The parting words of the presiding commissioner to the defendant succinctly confirm the lawlessness of the approach being followed by the Board and sanctioned by the courts in the growing number of cases such as this: "We just recommend that you continue your programming; you are doing a good job. Continue to remain disciplinary free. And it's just a matter of time before there's a Panel that feels like it's time." (Exh. A, p. 66.) But the granting of parole is not supposed to be a matter of whim. "[R]elease on parole is the rule, rather than the exception." (*In re Smith, supra,* 114 Cal.App.4th at p. 351.) "[A] grant of parole is an integral part of the penological system intended to help those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities . . . ." (*People v. Vickers* (1972) 8 Cal.3d 451, 458, 455; *Morissey v. Brewer* (1972) 408 U.S. 471, 477.) The applicable regulations prescribe numerous positive and negative factors that are to be weighed in determining an inmate's suitability for parole. The entire system becomes a mockery if all the Board need do to defer parole indefinitely

is to repeat the talismanic phrase, "the crime was callous." The Board here has recognized that absent this factor, defendant meets all of the criteria for parole and has done everything he conceivably can do to obtain his release. In my view, it is not sufficient to tell the defendant that he must wait until somebody, some day, feels like releasing him. This is not an acceptable rule of law.

_____

Pollak, J.

# EXHIBIT

# "II"

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

[X] **PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison..................................... _228_ Months

_120247_        _01_              _MURDER 2 UUC FA_
Case #                Count #                    Offense

B. Time for using a weapon............................ + _12_ Months

C. Time for other crimes................................ + _____ Months

Case #                Count #                    Offense        Months

Case #                Count #                    Offense        Months

Case #                Count #                    Offense        Months

D. Total term............................................. = _240_ Months

E. Time credit from _08/28/86_ to _08/10/06_  _76_ Months
              (Life term start date)   (Date of hearing)
_- 4 #115 IN 1988_

F. ......................................................... = _164_ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

**HEARING PANEL**

Name _Jack Garner_                        Date _08/_
Name _____                 Date _10/06_
Name _____                 Date _____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| LOPEZ, JESUS J | 37180 | CTF | 08/10/06 |

**BPT 1005(a)**(REV. 01/02)

Distribution: White –C. File
Canary- BPT
Pink- Prisoner

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )      CDC Number D-37180
Hearing of:               )
                          )
JESUS LOPEZ               )
_____)





CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 10, 2006

9:02 A.M.

PANEL PRESENT:

JACK GARNER, Presiding Commissioner
JEFF SELLWOOD, Deputy Commissioner

OTHERS PRESENT:

JESUS LOPEZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DAVID UGALDE, Interpreter
CORRECTIONAL OFFICER, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Marsha Mees, Peters Shorthand Reporting**

ii

## INDEX

                                                                Page

Proceedings........................................... 1

Case Factors.......................................... 9

Pre-Commitment Factors............................... 18

Post-Commitment Factors.............................. 28

Parole Plans.......................................... 22

Closing Statements................................... 44

Recess................................................ 54

Decision.............................................. 55

Adjournment........................................... 62

Transcriber Certification............................ 63

--oOo--

1

1      **P R O C E E D I N G S**

2          [Thereupon, inability to hear inmate,

3      malfunction with microphones and/or recording

4      equipment resulted in excessive indiscernibles.]

5          **DEPUTY COMMISSIONER SELLWOOD:**  We are on

6      the record.

7          **PRESIDING COMMISSIONER GARNER:**  Do you

8      solemnly swear or affirm that the translation

9      service you provide at this hearing, Spanish to

10     English, English to Spanish will be done to be

11     best of your ability?

12         **INTERPRETER UGALDE:**  Yes.

13         **PRESIDING COMMISSIONER GARNER:**  Very

14     good.  Thank you.  Good morning everyone.  This

15     is a subsequent parole consideration hearing for

16     Jesus Lopez.  Lopez is a Z at the end.  D like

17     David 37180.  The date today is Thursday,

18     August 10, 2006.  It's 9:02 a.m.  We're located

19     at the Correctional Training Facility in

20     Soledad.  The date today is August -- excuse me.

21     The inmate was received on August 28, 1986 from

22     San Francisco County.  The offense is murder in

23     the second degree with the use of a firearm.

24     Case number is 120247, count number one, PC 187

25     in the second and 12022.5.  The term was 17

26     years to life.  And the minimum eligible parole

27     date was May 7, 1996.  Other commitment offenses

2

1    include use of a firearm, PC 12022.5, same

2    county, same case number, and that's count

3    number two.  Also ADW, PC 245(a)(2), same

4    county, same case number, and that's also count

5    number two.  This hearing's going to be tape

6    recorded and for purposes of voice

7    identification each of us at the table is going

8    to be required to give our first name, last

9    name, spelling the last name.  When we get to

10   you, Mr. Lopez, if you'd also give your CDC

11   number please.  I'll start and go to my left.

12   I'm Jack Garner, G-A-R-N-E-R, Commissioner.

13        **DEPUTY COMMISSIONER SELLWOOD:**  Jeff

14   Sellwood, S-E-L-L-W-O-O-D, Deputy Commissioner.

15        **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

16   T-A-R-D-I double F, attorney for Mr. Lopez.

17        **INMATE LOPEZ:**  Jesus Lopez.  L-O-P-E-Z.

18   D-37190 [sic].

19        **INTERPRETER UGALDE:**  David Ugalde,

20   U-G-A-L-D-E, (indiscernible) county,

21   interpreter.

22        **PRESIDING COMMISSIONER GARNER:**  Very

23   good.  Thank you.  And for the record we do have

24   two correctional peace officers in the room for

25   purposes of security.  Okay.  Mr. Lopez and

26   Ms. Tardiff, I have in front of me the Board of

27   Prison Terms form for providing assistance,

1    reasonable accommodation that's associated with

2    Americans With Disabilities Act.  And Mr. Lopez

3    signed this form on March 1, 2006 indicating on

4    this form that he didn't need help for the

5    parole hearing.  There was also another form

6    where he had requested the services of an

7    interpreter.  On that one it indicated that you

8    speak and understand English but the interpreter

9    would be helpful for legal terms and things such

10   as that.  Is that correct?

11            **INMATE LOPEZ:**  That's correct.

12            **PRESIDING COMMISSIONER GARNER:**  Okay.

13   Also noted no disabilities identified from the

14   file review and a reading level of 12.9 and a

15   GED is noted.  So just to put on the record and

16   make sure there's nothing else that's happened

17   since March of this year, have you developed any

18   other condition in seeing or hearing that we

19   could provide you an accommodation?

20            **INMATE LOPEZ:**  No, Sir.

21            **PRESIDING COMMISSIONER GARNER:**  One other

22   -- Do you take any prescription medications for

23   --

24            **INMATE LOPEZ:**  No.

25            **PRESIDING COMMISSIONER GARNER:**  No.

26   Okay.

27            **INMATE LOPEZ:**  Except for the heartworms.

4

1   For the heartworms.

2        **INTERPRETER UGALDE:**  Heartburn.

3        **PRESIDING COMMISSIONER GARNER:**

4   Heartburn.  Okay.  Okay.

5        **ATTORNEY TARDIFF:**  It's this fine

6   institutional food probably.

7        **INMATE LOPEZ:**  Yes.

8        **PRESIDING COMMISSIONER GARNER:**  All

9   right.  Thank you.  All right.  ADA sufficiently

10   addressed, Ms. Tardiff?

11        **ATTORNEY TARDIFF:**  Yes, Sir.

12        **PRESIDING COMMISSIONER GARNER:**  Thank

13   you.  This hearing is being conducted pursuant

14   to Penal Code section 3041 and 3042 and the

15   rules and regulations of the Board of Parole

16   Hearings governing parole consideration hearings

17   for life inmates.  The purpose of today's

18   hearing is to consider your suitability for

19   parole.  In doing so, we'll consider the number,

20   the nature of the crimes you were committed for,

21   your prior criminal and social history and your

22   behavior and programming since your commitment.

23   We have had the opportunity to review your

24   Central File and your prior hearing transcript.

25   You'll be given the opportunity to correct or

26   clarify the record.  We'll consider your

27   progress since your commitment and since your

5

1   last hearing.  Your updated counselor's report
2   and psychological report will also be
3   considered.  And any change in your parole plans
4   should be brought to our attention.  We will
5   reach a decision today and inform you whether or
6   not we find you suitable for parole and the
7   reasons for our decision.  If you are found
8   suitable for parole, the length of your
9   confinement will be explained to you.  This
10  hearing will be conducted in two phases.  I'll
11  discuss with you the crime you were committed
12  for, your prior criminal and social history,
13  your parole plans and any letters of support or
14  opposition that may be in the file.
15  Commissioner Sellwood will discuss with you your
16  progress since your commitment, your counselor's
17  report and your psychological evaluation.  Once
18  that's concluded, the Commissioners and your
19  attorney will be given the opportunity to ask
20  you questions.  Before we recess for
21  deliberations, your attorney and you will be
22  given an opportunity to make a final statement
23  regarding your parole suitability.  Your
24  statement should be directed to why you feel
25  you're suitable for parole.  We will then
26  recess, clear the room and deliberate.  Once
27  we've completed our deliberations, we'll resume

6

1   the hearing and announce our decision.  The

2   California Code of Regulations states regardless

3   of time served a life inmate shall be found

4   unsuitable for and denied parole if in the

5   judgment of the Panel the inmate would pose an

6   unreasonable risk of danger to society or a

7   threat to public safety.  You also have the

8   right to have a timely notice to the hearing,

9   the right to review your Central File and the

10  right to present relevant documents.  And I'd

11  ask you at this time have those rights been met?

12       **INMATE LOPEZ:**  Yes.

13       **PRESIDING COMMISSIONER GARNER:**  Okay.

14  You also have a right to be heard by an

15  impartial Panel and today your Panel will

16  consist of myself and Commissioner Sellwood.

17  Any objection to the Panel?

18       **INMATE LOPEZ:**  No, Sir.

19       **PRESIDING COMMISSIONER GARNER:**  Okay.

20  You will receive a copy of our written tentative

21  decision today.  That decision is subject to

22  review by the Decision Review Unit.  It'll

23  become effective within 120 days.  And it's also

24  subject to review by the Governor.  And a copy

25  of the decision and a copy of the transcript

26  will also be sent to you in the future.  You

27  might recall from one of your previous hearings,

7

1    in May 2004 your appeal procedures changed.  If

2    you want to appeal a Panel decision now you have

3    to go through the courts.  Were you aware of

4    that?

5         **INMATE LOPEZ:**  I was.

6         **PRESIDING COMMISSIONER GARNER:**  Okay.

7    And you're not required to admit your offense or

8    discuss your offense if you do not wish to do

9    so.  However, this Panel does accept as true the

10   findings of the court and you're invited to

11   discuss the facts and circumstances of the

12   offense if you desire.  The Board will review

13   and consider any prior statements you've made

14   regarding the offense in determining your

15   suitability for parole.  And at this time I'll

16   ask Commissioner Sellwood if there's any

17   confidential material in the Central File and if

18   we'll be using it?

19        **DEPUTY COMMISSIONER SELLWOOD:**  None at

20   all.

21        **PRESIDING COMMISSIONER GARNER:**  Okay.

22   Very good.  Hearing checklist make it over there

23   somewhere?  I think it's over here to the side.

24   You got everything?

25        **ATTORNEY TARDIFF:**  I do have everything.

26        **PRESIDING COMMISSIONER GARNER:**  All

27   right.

8

1          **ATTORNEY TARDIFF:**  Thank you.

2          **PRESIDING COMMISSIONER GARNER:**  All

3    right.  Thank you.  And other than the documents

4    that you provided to me before the hearing,

5    anything additional today?

6          **ATTORNEY TARDIFF:**  Not unless something

7    comes up in the hearing there isn't anything.

8          **PRESIDING COMMISSIONER GARNER:**  All

9    right.  Any preliminary objections?

10          **ATTORNEY TARDIFF:**  No, Sir.

11          **PRESIDING COMMISSIONER GARNER:**  Mr. Lopez

12    be speaking with us today?

13          **ATTORNEY TARDIFF:**  Yes.

14          **PRESIDING COMMISSIONER GARNER:**  All

15    right.  Mr. Lopez, could I get you to raise your

16    right hand please.  Do you solemnly swear or

17    affirm that the testimony you give at this

18    hearing will be the truth, the whole truth and

19    nothing by the truth?

20          **INMATE LOPEZ:**  The truth, yes.

21          **PRESIDING COMMISSIONER GARNER:**  All

22    right.  Thank you.  Okay.  Let me put on the

23    record a summary of the commitment offense.  And

24    this summary is coming from a Board report that

25    was prepared for the June 2006 calendar and this

26    report was prepared by Correctional Counselor

27    Arno, A-R-N-O.

9

1          "Prior to 1:45 a.m. on October 26,

2          1983 Lopez and two other male

3          suspects entered the 20 Bar Club

4          and began drinking beer.  One of

5          Lopez's companions got into an

6          argument with one of the victims.

7          Lopez's companion walked over to

8          Lopez, conversed with him and then

9          walked out of the bar.  Upon the

10         return of his companion, Lopez

11         shot Robert or excuse me it's

12         Roberto -- copy is bad -- Barajas,

13         B-A-R-A-J-A-S, with a .32 caliber

14         pistol.  The victim fell to the

15         floor.  According to witnesses,

16         Lopez shot him three more times.

17         The first bullet entered below the

18         right ear.  The second entry was

19         noted in the midline of the neck

20         and the third shot entered the

21         right chest area.  The fourth shot

22         entered the abdomen resulting in

23         victim Barajas' death.  Lopez was

24         also identified shooting another

25         victim during the gunfire.  Victim

26         Guadalupe Olmedo, O-L-M-E-D-O,

27         sustained multiple gunshot wounds.

10

1          Lopez and his companions fled the
2          bar and escaped in a late 70's
3          model vehicle which according to
4          witnesses was parked in front of
5          the club.  Lopez remained at large
6          from October 26, 1983 until his
7          apprehension by immigration and
8          naturalization officials in August
9          25 -- excuse me -- on August 25,
10         1985."
11    Okay.  All right.  Let me --
12         **INMATE LOPEZ:**  I have a question, you
13    said 1985 or 1986?
14         **PRESIDING COMMISSIONER GARNER:**  The
15    apprehension by INS?
16         **INMATE LOPEZ:**  Yes.
17         **PRESIDING COMMISSIONER GARNER:**  On my
18    report it says 1985.
19         **INMATE LOPEZ:**  That's correct.
20         **PRESIDING COMMISSIONER GARNER:**  Is that
21    correct?  Okay.  All right.  Well let me start
22    by asking, that's a fairly short version of a
23    crime summary.  Is it -- Is it an accurate
24    version?
25         **INMATE LOPEZ:**  That's correct.
26         **PRESIDING COMMISSIONER GARNER:**  All
27    right.  Let me ask you a couple of other

11

1    questions then.  Prior to going to this bar, had

2    you been drinking before that?

3         **INMATE LOPEZ:**  Yes.

4         **PRESIDING COMMISSIONER GARNER:**  Had you

5    been using any drugs?

6         **INMATE LOPEZ:**  (Indiscernible).

7         **PRESIDING COMMISSIONER GARNER:**  All

8    right.  And this victim, Mr. Barajas, had you

9    ever met him before this evening?

10        **INMATE LOPEZ:**  Never.

11        **PRESIDING COMMISSIONER GARNER:**  When one

12   of your companions had the argument with

13   Mr. Barajas --

14        **INMATE LOPEZ:**  No, Sir.

15        **PRESIDING COMMISSIONER GARNER:**  No one

16   had an argument?

17        **INMATE LOPEZ THROUGH INTERPRETER:**  Just

18   myself.

19        **PRESIDING COMMISSIONER GARNER:**  All

20   right.  So you had an argument with Mr. Barajas?

21        **INMATE LOPEZ:**  I did.

22        **PRESIDING COMMISSIONER GARNER:**  Okay.

23   Were you armed with a .32 caliber when you

24   walked into the bar?

25        **INMATE LOPEZ:**  Not the first time.

26        **PRESIDING COMMISSIONER GARNER:**  So you

27   had to leave the bar and go obtain the weapon?

12

1      **INMATE LOPEZ:**  That's correct, Sir.

2      **PRESIDING COMMISSIONER GARNER:**  Where was

3  the weapon?

4      **INMATE LOPEZ:**  Inside the car.

5      **PRESIDING COMMISSIONER GARNER:**  It was in

6  the car.  And how did you -- how did you get

7  this weapon?

8      **INMATE LOPEZ:**  I buy it on the street.

9      **PRESIDING COMMISSIONER GARNER:**  Bought it

10  on the street.  Okay.  Had you ever shot the

11  weapon before?

12      **INMATE LOPEZ:**  No, Sir.

13      **PRESIDING COMMISSIONER GARNER:**  Had you

14  ever shot a weapon similar to that before?

15      **INMATE LOPEZ:**  No, Sir.

16      **PRESIDING COMMISSIONER GARNER:**  And was

17  this a semiautomatic or a revolver?

18      **INMATE LOPEZ:**  Semi.

19      **PRESIDING COMMISSIONER GARNER:**  Semi.

20  And when you obtained it from the vehicle, did

21  you know it was loaded?

22      **INMATE LOPEZ:**  Yes.

23      **PRESIDING COMMISSIONER GARNER:**  Had you

24  personally at some point loaded the weapon?

25  Maybe not that day but before that?

26      **INMATE LOPEZ:**  Yes, Sir, I

27  (indiscernible).

13

1      **PRESIDING COMMISSIONER GARNER:**  You

2    didn't load it that -- at the time of the

3    shooting?

4          **INMATE LOPEZ:**  No, no, no.

5          **PRESIDING COMMISSIONER GARNER:**  Okay.

6    You just went and got the weapon?

7          **INMATE LOPEZ:**  Yes.

8          **PRESIDING COMMISSIONER GARNER:**  Was --

9    Mr. Barajas, any indication he was drunk?

10          **INMATE LOPEZ:**  Yes, he was drunk.

11          **PRESIDING COMMISSIONER GARNER:**  And what

12    was the size difference between you and

13    Mr. Barajas?  Who was bigger?

14          **INMATE LOPEZ THROUGH INTERPRETER:**

15    Remember that we were the same.

16          **PRESIDING COMMISSIONER GARNER:**  About the

17    same.  Okay.  Mr. Barajas threatened you?

18          **INMATE LOPEZ:**  I feel that way, yes.

19          **PRESIDING COMMISSIONER GARNER:**  What did

20    he say specifically that made you feel that way?

21          **INMATE LOPEZ THROUGH INTERPRETER:**  I saw

22    his friends that they were encouraging him.  He

23    started talking -- naming my mother and I

24    couldn't control those words -- word and I felt

25    attacked.

26          **PRESIDING COMMISSIONER GARNER:**  Okay.

27    What was the initial argument about?

14

1          **INMATE LOPEZ:**  It was all about why you

2     looking at me and so on, why is -- just --

3          **INMATE LOPEZ THROUGH INTERPRETER:**  Why

4     are you looking at me?  Why do you come over

5     here?

6          **INMATE LOPEZ:**  To this place.  To this

7     place.

8          **INMATE LOPEZ THROUGH INTERPRETER:**  It get

9     started like that.

10          **PRESIDING COMMISSIONER GARNER:**  And had

11     you ever been to this bar before?

12          **INMATE LOPEZ:**  Never, Sir.

13          **PRESIDING COMMISSIONER GARNER:**  Did the

14     people in the bar seem to know Mr. Barajas?

15          **INMATE LOPEZ:**  I believe so, yes.

16          **PRESIDING COMMISSIONER GARNER:**  Okay.  So

17     in response to the threat that you felt, you

18     went out and got your gun?

19          **INMATE LOPEZ:**  That's correct.

20          **PRESIDING COMMISSIONER GARNER:**  Did you

21     ever think about just leaving?

22          **INMATE LOPEZ:**  Never.  Never.

23          **PRESIDING COMMISSIONER GARNER:**  And is it

24     correct that you were there with companions?

25          **INMATE LOPEZ:**  That's correct.

26          **PRESIDING COMMISSIONER GARNER:**  Two

27     people were with you?

15

1       **INMATE LOPEZ:**  That's correct -- correct.

2       **PRESIDING COMMISSIONER GARNER:**  And they

3   had also been drinking with you before going to

4   the bar?

5       **INMATE LOPEZ:**  Yes.

6       **PRESIDING COMMISSIONER GARNER:**  And the

7   second victim, Guadalupe Olmedo, you didn't --

8   did you know her?

9       **INMATE LOPEZ:**  No.

10      **PRESIDING COMMISSIONER GARNER:**  And my

11  understanding from reading some of the reports

12  that that was not an intended victim, you didn't

13  intend to shoot her?

14      **INMATE LOPEZ:**  Never, Sir.

15      **PRESIDING COMMISSIONER GARNER:**  All

16  right.  But you did intend to shoot Mr. Barajas?

17      **INMATE LOPEZ:**  Yes.

18      **PRESIDING COMMISSIONER GARNER:**  Okay.

19  And at some point after the shooting you fled.

20  The vehicle was out front.  And I believe that

21  -- that the October 25 arrest by the INS

22  coincides with an arrest for smuggling aliens,

23  is that correct?

24      **INMATE LOPEZ:**  Was in August.  Wasn't

25  October.  Was in August.

26      **INTERPRETER UGALDE:**  He said it was in

27  August.

16

1          **PRESIDING COMMISSIONER GARNER:**  August.

2          **INMATE LOPEZ:**  That's correct.

3          **PRESIDING COMMISSIONER GARNER:**  And this

4     was in Texas?

5          **INMATE LOPEZ:**  In Texas.

6          **PRESIDING COMMISSIONER GARNER:**  Okay.  So

7     that's where they found out you had the warrant

8     and you were wanted in San Francisco.

9          **INMATE LOPEZ:**  Yes.

10         **PRESIDING COMMISSIONER GARNER:**  And you

11    were returned to San Francisco.

12         **INMATE LOPEZ:**  Correct.

13         **PRESIDING COMMISSIONER GARNER:**  Okay.

14    Any of your companions get charged with anything

15    on this?

16         **INMATE LOPEZ:**  No, Sir.

17         **PRESIDING COMMISSIONER GARNER:**  They

18    weren't known, were they?

19         **INMATE LOPEZ:**  Yes.

20         **PRESIDING COMMISSIONER GARNER:**  The

21    police knew who they were.  Okay.  Well, I'm

22    just curious about that.  It doesn't have

23    anything to do with you today.  What did you do

24    with the weapon after the shooting?

25         **INMATE LOPEZ:**  I left it at the house.

26         **PRESIDING COMMISSIONER GARNER:**  Where

27    were you living at that time?

17

1        **INMATE LOPEZ:** Fifteenth Street, 1470.

2        **PRESIDING COMMISSIONER GARNER:** In San

3    Francisco?

4        **INMATE LOPEZ:** San Francisco.

5        **PRESIDING COMMISSIONER GARNER:** So when

6    you left town, you left the weapon there?

7        **INMATE LOPEZ:** Yes, Sir.

8        **PRESIDING COMMISSIONER GARNER:** And your

9    intent in leaving is to get away from the

10   charges?

11       **INMATE LOPEZ:** Yes, in one way, yes. And

12   I was so --

13       **INMATE LOPEZ THROUGH INTERPRETER:**

14   Shocked by the (indiscernible).

15       **PRESIDING COMMISSIONER GARNER:** Okay.

16   When did you learn that Mr. Barajas died?

17       **INMATE LOPEZ:** The next day.

18       **PRESIDING COMMISSIONER GARNER:** And how

19   did you hear?

20       **INMATE LOPEZ:** Through the TV.

21       **PRESIDING COMMISSIONER GARNER:** You saw

22   it on TV?

23       **INMATE LOPEZ:** Yes.

24       **PRESIDING COMMISSIONER GARNER:** And the

25   TV had enough on the screen that you knew the

26   location, you put two and two together and

27   figured that was the one you did?

18

1        **INMATE LOPEZ:**  Well I remember that day

2    so I see that.  I see the sign of the club.

3        **PRESIDING COMMISSIONER GARNER:**  And the

4    story included the fact that he had died.  Okay.

5    All right.  We already talked about the

6    non-controlling case, which is the one we read

7    in the record, and that was the Guadalupe

8    Olmedo, which is -- those charges are going to

9    run concurrent to what you're doing on the life

10   crime.  And we've already talked your only other

11   adult arrest, which was in Texas for the issues

12   with the aliens which got you back here.  Okay.

13   Okay.  Let's go then to your personal life okay.

14   You're one of eight children that were born to

15   Rafael and how do you pronounce your mother's

16   name?

17       **INMATE LOPEZ:**  Auxiliadora.

18       **PRESIDING COMMISSIONER GARNER:**

19   Auxiliadora, A-U-X-I-L-I-A-D-O-R-A.  Does she

20   have a shorter nickname?

21       **INMATE LOPEZ:**  Maria.

22       **PRESIDING COMMISSIONER GARNER:**  Okay.

23   Okay if I use Maria if I have to say it again?

24   Thank you.  And Banuelas, B-A-N-U-E-L-A-S, is

25   the -- is the last name.  And that you were born

26   on September 21, 1960.

27       **INMATE LOPEZ:**  That's correct.

19

1          **PRESIDING COMMISSIONER GARNER:**   In
2    Durango.  All right.  And family resources were
3    limited and you left Mexico at the age of 19 to
4    start earning a living.  Is that correct?
5          **INMATE LOPEZ:**  That is correct.
6          **PRESIDING COMMISSIONER GARNER:**  Okay.
7    And you graduated from high school in Mexico.
8          **INMATE LOPEZ:**  (Indiscernible).
9          **PRESIDING COMMISSIONER GARNER:**  And the
10   report indicates that you -- you came in
11   illegally.  Okay.  Did you come in by yourself
12   or did you pay someone to bring you in?
13         **INMATE LOPEZ:**  No, I come by myself.
14         **PRESIDING COMMISSIONER GARNER:**   By
15   yourself.  Okay.  And you went to Colorado.
16         **INMATE LOPEZ:**  I went to Colorado.
17         **PRESIDING COMMISSIONER GARNER:**  How did
18   you pick Colorado?  Friends, family there?
19         **INMATE LOPEZ:**  It was my brother over
20   there.
21         **PRESIDING COMMISSIONER GARNER:**  All
22   right.
23         **INMATE LOPEZ:**  I just stay for a little
24   while, a couple of months and went back to --
25         **PRESIDING COMMISSIONER GARNER:**  Okay.
26   That's -- indication that you returned to Mexico
27   and you married your wife Magdalena,

20

1   M-A-G-D-A-L-E-N-A, and moved to San Francisco in

2   1979.

3        **INMATE LOPEZ:**   That's correct.

4        **PRESIDING COMMISSIONER GARNER:**   And you

5   lived in the Mission District and worked as a

6   butcher's helper for the Marshall,

7   M-A-R-S-H-A-L-L, & Henry Company and in '79 it

8   says you were making about 200 a week?

9        **INMATE LOPEZ:**   Close to 300.

10        **PRESIDING COMMISSIONER GARNER:**   Close to

11   300.   Back in '79 that was pretty good money.

12        **INMATE LOPEZ:**   (Indiscernible).

13        **PRESIDING COMMISSIONER GARNER:**   Yeah.

14   And you have one child by the name of Rafael

15   born in San Francisco.   And then after the

16   incident that you fled back to Mexico and worked

17   in a variety of part-time jobs but there wasn't

18   enough to support you and that you were en route

19   to Texas when you were apprehended by the

20   immigration officers.   And substance abuse,

21   occasional marijuana, cocaine, alcohol, all in

22   the past.   When did you start -- Let me ask when

23   you first start using drugs?

24        **INMATE LOPEZ:**   Well I just tasting so I

25   don't really --

26        **PRESIDING COMMISSIONER GARNER:**   So you --

27        **INMATE LOPEZ:**   -- wasn't addicted to

21

1    marijuana or cocaine.  I just taste it maybe

2    that night when I commit the crime.  But I

3    (indiscernible) Tequila or (indiscernible), yes,

4    (indiscernible).

5        **PRESIDING COMMISSIONER GARNER:**  All

6    right.  And the night of the crime that you'd

7    been drinking heavily prior to the incident.

8    Was there some reason that night that you'd been

9    drinking more heavily?

10       **INMATE LOPEZ:**  No, it just was because I

11   was (indiscernible).

12       **PRESIDING COMMISSIONER GARNER:**  Was

13   Magdalena home while you were out drinking?

14       **INMATE LOPEZ:**  Yes.

15       **PRESIDING COMMISSIONER GARNER:**  And she

16   was home with Rafael.

17       **INMATE LOPEZ:**  Yes.

18       **PRESIDING COMMISSIONER GARNER:**  But you

19   were out with a couple of your friends --

20       **INMATE LOPEZ:**  Yes.

21       **PRESIDING COMMISSIONER GARNER:**  --

22   drinking.

23       **INMATE LOPEZ:**  Yes, Sir.

24       **PRESIDING COMMISSIONER GARNER:**  And whose

25   vehicle was it that you were in?

26       **INMATE LOPEZ:**  My friend's.

27       **PRESIDING COMMISSIONER GARNER:**  Your

22

1    friend's.  Okay.  And that in the past you

2    didn't want to accept that you had a problem

3    with alcohol but you started going to AA and it

4    made you realize that you did.  Is that true?

5         **INMATE LOPEZ:**  That's correct.

6         **PRESIDING COMMISSIONER GARNER:**  Okay.

7    Any time while you were in Mexico as a child

8    were you ever hospitalized for anything?

9         **INMATE LOPEZ:**  No, Sir.

10        **PRESIDING COMMISSIONER GARNER:**  Never

11   been in the hospital.  Okay.  So far as the

12   parole plans, and I have to go back to a Board

13   report from 2003 but I think they're still

14   relevant, that you'd be residing with your

15   mother Maria Lopez in Durango.  Family owns a

16   ranch there.

17        **INMATE LOPEZ:**  That's correct, Sir.

18        **PRESIDING COMMISSIONER GARNER:**  And that

19   you would continue to be involved with AA in

20   Mexico.  And there's an address noted for AA in

21   Durango.  So far as employment that you'd seek

22   employment in the auto mechanics field with the

23   skills that you learned with CDC and we'll let

24   Commissioner Sellwood get more into some of your

25   vocation stuff a little bit later in the

26   hearing.  Let me go ahead and put on the record

27   the letters that were given to me today by Miss

23

1    Tardiff.  The first one is a memo and it's on

2    State letterhead and this is from the PIA and

3    it's done by Charlie Walker.  And Charlie is

4    C-H-A-R-L-I-E and again it's dated June 9.  And

5    inform the Panel that you would be provided with

6    the former PIA worker card indicating the

7    following.  That the -- That you have a work

8    history with PIA where you've learned specific

9    job skills and developed valuable work habits in

10   a businesslike setting.  And it provides the

11   contact points so that the employer and anyone

12   else that wants to learn, which you did, would

13   be available to them.  And gives the number for

14   the employment program coordinator.  Okay.  Do

15   the one from your mother next.  And this one is

16   dated June 25, 2006. It's a typed letter and

17   signed.  And it's again asking for a favorable

18   decision, granting you a second chance at

19   liberty.  She knows about the errors that you've

20   committed, that you're a good person.  It talks

21   about your rehabilitation, that you've been

22   molded into a better man that's accepted his

23   errors and demonstrated great remorse for them.

24   And having you home will be beneficial to the

25   family and the community.  You've learned to be

26   a provider and honest, respectable person.

27   Those attributes will help the family very much

24

1    and because of what you've done the community --

2    it'll be an example to the community.  And it

3    speaks to your workday, speaking to some of the

4    crops they have on the farm, corn, beans and hay

5    and also the farm stock.  You have her total

6    support and help as well as home, food,

7    clothing, transportation and the work that's

8    provided.  So we have an offer from your mother

9    of housing, support and employment.  I have a

10   June 29, 2006 typed letter from Lazaro Rayes,

11   R-A-Y-E-S, Lazaro is L-A-Z-A-R-O.  He's a

12   realtor, has been for 15 years.  Writing to

13   request that you get a second chance to be free,

14   it's been lost time, that you've paid your debt

15   and learned a harsh lesson, family, friends are

16   very committed to help you reenter.  They're

17   willing to help with employment, housing, job

18   training and anything else.  And it speaks to

19   your positive contributions while you've been in

20   the facility and he's writing as a taxpayer and

21   a Vietnam veteran, seen a lot of waste, that you

22   could also become a taxpayer and not a tax

23   depleter.  And how do you know Mr. Rayes?

24        **INMATE LOPEZ:**  Through my mom.

25        **PRESIDING COMMISSIONER GARNER:**  Okay.

26   Okay.  The next one is from a Luis

27   (indiscernible) and I can't make -- is that

25

1   another name after (indiscernible) or is it just

2   -- there's something underneath the stamp and I

3   can't tell what it is.

4       **INMATE LOPEZ:**  Their last name is Acosta.

5       **PRESIDING COMMISSIONER GARNER:**  Okay.

6   It's dated June 26 and he's an official

7   representative of the small honest community of

8   (indiscernible).  He's writing brief words to

9   indicate the support, that he's known you since

10  childhood.  Talks to the error that you made but

11  you'll be positive and cooperative with the

12  community and you have and always will have the

13  sympathy and respect of all the community.

14  Asking that a favorable decision to give you a

15  second chance and they're committed to help you

16  return back to normal life.  As a judge in the

17  community he's committed himself along with his

18  staff in assuring that you'll have a place to

19  work so that you can help with the economic

20  needs and also help with the city's economy with

21  your own work ethic.  And again hoping that

22  we'll render a favorable decision to have you

23  return back with them.  And my last one is from

24  Martin Lopez Betancourt, B-E-T-A-N-C-O-U-R-T,

25  and from Durango and I'll see if there's a date

26  on it.  June 26, 2006.  Writing a letter of

27  support to my nephew.  Speaking to the hope that

26

1    you'll be granted a date.  Let's see.  And would

2    provide for him encouragement, support, a career

3    and a home and community that was the community

4    of your youth and that you grew up with his

5    children, they consider you more than a nephew,

6    more like a son.  He has nephews but you've

7    become the favorite one.  Speaks to the mistake

8    that you made but given the chance as you grow

9    up, grow older, grow wiser and more aware --

10   accepting your responsibility.  He knows that

11   you'll be a productive member of our small

12   community.  Again it speaks to it being small,

13   close knit and rural.  And despite your mistakes

14   that you're a good boy, concerned citizen and an

15   empathetic person.  Talks to your AA and speaks

16   to those seeds that you have made will be

17   sprouted into real life changing forces.  And

18   you realize your true potential.  Says entire

19   community -- willing and waiting, wanting to

20   support Jesus in all he will need to begin a new

21   life upon parole.  He already has a place to

22   live, a good job working on and with me at the

23   family ranch which has been in the family for

24   generations.  And he basically says that he can

25   promise us that with all certainly that you will

26   not willingly break the law nor return to the

27   United States.  And he says only a fool makes

26

1    you'll be granted a date.  Let's see.  And would
2    provide for him encouragement, support, a career
3    and a home and community that was the community
4    of your youth and that you grew up with his
5    children, they consider you more than a nephew,
6    more like a son.  He has nephews but you've
7    become the favorite one.  Speaks to the mistake
8    that you made but given the chance as you grow
9    up, grow older, grow wiser and more aware --
10   accepting your responsibility.  He knows that
11   you'll be a productive member of our small
12   community.  Again it speaks to it being small,
13   close knit and rural.  And despite your mistakes
14   that you're a good boy, concerned citizen and an
15   empathetic person.  Talks to your AA and speaks
16   to those seeds that you have made will be
17   sprouted into real life changing forces.  And
18   you realize your true potential.  Says entire
19   community -- willing and waiting, wanting to
20   support Jesus in all he will need to begin a new
21   life upon parole.  He already has a place to
22   live, a good job working on and with me at the
23   family ranch which has been in the family for
24   generations.  And he basically says that he can
25   promise us that with all certainly that you will
26   not willingly break the law nor return to the
27   United States.  And he says only a fool makes

27

1   the same mistake twice.  And then thanks us for

2   our concern and time.  Okay.  Those are the

3   recent letters we have?  Okay.

4       **ATTORNEY TARDIFF:**  I'd also like to add

5   that I placed a phone call to his family in

6   Durango through an interpreter, not a certified

7   interpreter but someone that I work with, to

8   verify the letters from '05.  And they stated

9   that everything was current and that they

10  strongly support Mr. Lopez.

11      **PRESIDING COMMISSIONER GARNER:**  Okay.

12  Thank you.  I also want to put on the record

13  that insomuch as -- last hearing on June 30,

14  2005 I did read the transcript with respect to

15  this particular section of the hearing.  I did

16  that because there's a rather large number of

17  letters that were sent for the last hearing and

18  frankly I was really hoping we didn't get this

19  many this time that I have to read.  Thank you.

20  But it does acknowledge the nature and intent of

21  all of the letters.  And since they are fairly

22  recent I want to make sure that we have on the

23  record that this is a sustained, ongoing pattern

24  of support.  Okay.  Mr. Lopez, at this time I'm

25  going to ask you to direct your attention over

26  here to Commissioner Sellwood.

27      **DEPUTY COMMISSIONER SELLWOOD:**  Good

28

1    morning, sir.

2        **INMATE LOPEZ:**  Good morning.

3        **DEPUTY COMMISSIONER SELLWOOD:**   As

4    happened to me yesterday, I made a mistake and

5    everyone pointed it out.  So please feel free to

6    do so if that happens again.  So what I'm going

7    to do is review quite a bit of information and

8    either fill in anything I've left out or if you

9    see -- here that I've said anything incorrectly

10   go ahead and correct me.  All right.  Your

11   classification level is 19.  Your custody level

12   is Medium A.  Your last hearing was June 30,

13   '05.  It was the subsequent hearing number seven

14   and resulted in a one year denial.  You were

15   received at Soledad on April 12, 2000 coming up

16   from RJ Donovan.  Okay.  One of the best, almost

17   perfect disciplinary record, only one blotch on

18   your entire history, a 115 in June of 1988 for

19   having a radio on without headphones.  And

20   that's the only 115 that you have ever received

21   and you have never received a 128.  So kind of

22   like the West Point guy that gets one demerit.

23   Okay.  Can't get through.  I'm going to review

24   the time period since your last hearing.  And --

25   takes in a little bit more than that but it's

26   the review from the counselor.  It's from

27   September '04 to September '05.  States that in

29

1    terms of vocational training there was no

2    vocational training noted in that one year time.

3    There were no academics.  Work record, you

4    continue to work at the Protestant chapel as a

5    porter.  Group activities.  You continued your

6    participation in AA and NA.  And I wanted to ask

7    you a question about that.  I also have some

8    more updated chronos which were provided here by

9    your counsel and then I even found some more

10   that weren't provided that are past the date of

11   the last review here.  And I'm just a little bit

12   confused and need to understand.  From this I've

13   been able to gather that you attend a Monday

14   evening NA slash AA meeting and then you attend

15   a Wednesday day evening of the same type of

16   group and then there's mention of a third group,

17   the 12-Step program which based upon NA, AA.  So

18   are there really three different programs that

19   you attend?

20          **INMATE LOPEZ:**  That's correct, Sir.

21          **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  I

22   wasn't sure if they were the same, but they are

23   three different programs?

24          **INMATE LOPEZ:**  Three different programs.

25          **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And

26   I was able to find evidence very early in the

27   '90s of your attendance at AA.  So it looks like

30

1   you have been attending some sort of AA, NA
2   program throughout your history of being prison.
3   Is that true?  That's what the chronos say.
4   Okay.  In terms of -- let's see -- the next year
5   was the September of '05 through March of '06.
6   And again vocational training none noted.
7   Academics, none noted.  Work record, you were
8   moved to the east dorm and assigned to the PIA
9   wood product section as a furniture finisher.
10  Group activities, continue the AA and NA.  And
11  then as I noted I have chronos all the way up to
12  the ones that your counsel provided which are
13  dated July of this year and I have others back
14  in April of this year about your continued
15  attendance at AA.  I noted that there was a
16  chrono in there, there was actually several of
17  them saying that once you got into the -- it's
18  called the finish mill shop, is that right?
19          **INMATE LOPEZ:**  Yes, Sir.
20          **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And
21  that you immediately received instruction in
22  fire safety, hand tools, portable power tools,
23  table saw, automatic feeder.  You accomplished
24  all of that successfully.  I noticed that there
25  was mention of prior auto mechanic courses.  So
26  you took auto mechanic courses, when did you
27  take those?

31

1      **INMATE LOPEZ:**  In Donovan.

2      **DEPUTY COMMISSIONER SELLWOOD:**  At

3   Donovan.  Okay. And I guess my question to you

4   is do you consider yourself to have an

5   employable vocational skill?  And if so, what is

6   it?  Would it be as an auto mechanic, a

7   woodworker, a landscaper?  Do you have a skill

8   that you could sell out there for employment?

9      **INMATE LOPEZ THROUGH INTERPRETER:**  Thanks

10   to these programs that they help me to qualify

11   and I think I could do a good job if they give

12   me the opportunity.  I like the field a lot, the

13   fields.  (Indiscernible) --

14      **DEPUTY COMMISSIONER SELLWOOD:**

15   (Indiscernible) --

16      **INMATE LOPEZ THROUGH INTERPRETER:**  --

17   plumbing.

18      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

19   Okay.  So the woodworking might be more of a

20   handyman tool for you as opposed to an

21   employment?

22      **INMATE LOPEZ:**  Yes, Sir.

23      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And

24   your intent would be to go back to the family

25   ranch where you would use many tools and as you

26   said the fields and --

27      **INMATE LOPEZ:**  Yes.

32

1    **DEPUTY COMMISSIONER SELLWOOD:** Okay. All

2    right. I noticed that you accomplished a GED

3    and there was some mention that you had taken I

4    thought a few college classes. Did you ever

5    take any college classes?

6    **INMATE LOPEZ:** In Mexico, yes, I did.

7    **ATTORNEY TARDIFF:** Yeah, he went to three

8    years in Mexico.

9    **DEPUTY COMMISSIONER SELLWOOD:** Three

10   years of college --

11   **ATTORNEY TARDIFF:** Before --

12   **DEPUTY COMMISSIONER SELLWOOD:** -- in

13   Mexico.

14   **ATTORNEY TARDIFF:** --- the commitment

15   offense.

16   **DEPUTY COMMISSIONER SELLWOOD:** Okay.

17   Okay. I also noticed that under self-help in

18   April of '06, that was more of the AA's. All

19   right. In June of '06 you took a three-hour

20   video course under the auspices of the Inmate

21   Employability program related to Anger

22   Management. And you also took a three-hour

23   video course on Reengaging Society. Okay. Then

24   presented to us today were these two items.

25   They're not dated. Is this recent work or work

26   over a long period of time?

27   **INMATE LOPEZ:** The Living Sober is

33

1    recent, that one right there.  And the other one

2    was about a year ago.

3         **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  All

4    right.  These are -- The first one, the Living

5    Sober, which you said was the more recent one.

6         **INMATE LOPEZ:**  Yes.

7         **DEPUTY COMMISSIONER SELLWOOD:**  This says

8    by AA World Services, book review by Jesus

9    Lopez.  And what it is is you have -- I assume

10   all of this is your writing.

11        **INMATE LOPEZ:**  Yes.

12        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

13   What you have done is go through and it appears

14   respond to a variety of questions or situations

15   that the book offers and then you have put down

16   your personal response to that.

17        **INMATE LOPEZ:**  That's correct, Sir.

18        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  A

19   somewhat anecdotally funny but also very

20   serious, you talked about going into a bar and

21   that to get a drink you would put your entire

22   life down, the cost of a drink would be your

23   entire life.  And that was very, very serious.

24   On the other hand it said put a buck down for a

25   drink and I thought that was a little dated.

26   You don't put a buck down anymore.

27        **INDISCERNIBLE SPEAKER:**  (Indiscernible).

34

1          **DEPUTY COMMISSIONER SELLWOOD:**  A few more

2    dollars.

3          **INMATE LOPEZ:**  Yes.

4          **DEPUTY COMMISSIONER SELLWOOD:**  Yes.  But

5    some very good thoughts that you had.  I was

6    especially impressed by the thought that to buy

7    a drink today would cost you your life.

8          **INMATE LOPEZ:**  That's correct.

9          **DEPUTY COMMISSIONER SELLWOOD:**  The other

10   one, Staying Sober, A Guide For Relapse

11   Prevention by Terrance Gorsky (phonetic)

12   (indiscernible) Miller, book review by Jesus

13   Lopez, and basically the same thing.  The same

14   review and personal responses.

15         **INMATE LOPEZ:**  That's correct, Sir.

16         **DEPUTY COMMISSIONER SELLWOOD:**  Other

17   folks may do this but I know there are times

18   when we ask people if you can't get what you

19   need from the institution do personal study in

20   your cell, do something positive.  This is very

21   positive evidence that you have taken the

22   initiative to do things on your own and not just

23   say I did it but actually go through and do a

24   lot of work.  There's a lot of work in each of

25   those.

26         **INMATE LOPEZ:**  Thank you, Sir.

27         **DEPUTY COMMISSIONER SELLWOOD:**  Very

35

1    positive work.  I'm now going to review the

2    psychiatric reports.  Now as folks here know,

3    what we have is a September of '03 report and

4    then before that we have a June 6, '02 report

5    which is basically nothing.  It's a two

6    paragraph statement.  Then we have a January '01

7    two paragraph statement.  And then we have

8    February of 2000 assessment, then we have prior

9    assessments.  What I'm going to do is I'm going

10   to back up actually four assessments to give

11   because there was a statement in the 2000 that

12   was somewhat bothersome and I wanted to review

13   and see where that was.  So I'm going to start

14   off by just talking about the statement in the

15   2000 and I'll -- well in fact let me just read

16   it.  Okay.  Why it was potentially bothersome.

17   Okay.  It's page five of the two -- make sure

18   I'm in the right one.  Yeah.  Okay.  Page five

19   and it -- under section 14, assessment of

20   dangerousness.

21          "Mr. Lopez's violence potential

22          outside a controlled setting in

23          the past is considered to have

24          been average and at present is

25          estimated to be decreased.  If

26          released to the community, he

27          would -- all probability be likely

36

1          to continue improvement given his

2          defined set of personal

3          expectations and goals."

4     That's not an overwhelmingly positive -- you

5     know, if released he would continue to improve,

6     it used to be average, now it's decreased.  And

7     so I wanted to back up behind that and see what

8     had been said in prior times to see where that

9     came from.  So I backed up a little bit to the

10    December 1998 calendar, which is a single page,

11    but at the very bottom of the page it says:  "If

12    released to the community, he probably would

13    represent a low risk of danger to others as long

14    as there is no relapse into alcohol or drug

15    abuse."  So that didn't seem to be what the

16    person was relying upon.  So I backed up again

17    to the next one.  Excuse me.

18         [Thereupon, the tape was turned over.]

19         **DEPUTY COMMISSIONER SELLWOOD:**  -- record

20    on side two.  So I went back to 1997 and on the

21    second page it says:  "My professional opinion

22    is that inmate Lopez represents a low risk to

23    the public compared to other inmates with a

24    history of violence."  So I -- having read that

25    in the 2000 report, I questioned what that meant

26    and going back to prior reports I don't see that

27    evidence of unsuredness (phonetic).  Both of

1    those suggest a low chance of dangerousness.  So
2    anyway, I wanted to get that on the record.  And
3    then let me go ahead and read from the 2003 --
4    which is the most recent one and go ahead and
5    continue that same thought.  On assessment of
6    dangerousness:

7         "His risk of violent behavior
8         within a controlled setting is
9         considered to be low compared to
10         the average level two inmate
11         population.  If released to the
12         community, in light of the above
13         factors his violence potential is
14         describe -- is considered to be
15         low.  Alcohol abuse is a risk
16         factor which may be a precursor to
17         violence for this individual."

18    Okay.  And then from the 2003 again item number
19    12, the current mental status, Axis I, Alcohol
20    Abuse In Sustained Full Remission In A
21    Controlled Environment.  Axis II, No
22    Contributory Personality Disorder.  And again, I
23    did not have an Axis III or IV or V.  But
24    referring back to the 2000 the GAF score was 80.
25    So I'm assuming that it has stayed somewhat the
26    same.  Under the clinical observation:

27         "This inmate is competent and

38

1          responsible for his behavior.

2          This inmate does not have a mental

3          disorder which would necessitate

4          treatment.  This inmate has a

5          significant alcohol history.

6          However, his problem appears to be

7          in remission. Continued

8          participation within AA is

9          suggestion."

10   And it says during his incarceration.  I would

11   certainly add to that and for lifetime.  That

12   takes care of my part, Commissioner.

13          **PRESIDING COMMISSIONER GARNER:**  Around

14   the year 2000, where you assigned as an

15   electrician?

16          **INMATE LOPEZ:**  That's correct.

17          **PRESIDING COMMISSIONER GARNER:**  How long

18   did you work as an electrician?

19          **INMATE LOPEZ:**  For about four years.

20          **PRESIDING COMMISSIONER GARNER:**  Four

21   years.  Okay.  Is your marriage to Magdalena

22   still intact?

23          **INMATE LOPEZ:**  No.

24          **PRESIDING COMMISSIONER GARNER:**  No.  And

25   did you divorce?

26          **INMATE LOPEZ:**  Yes.

27          **PRESIDING COMMISSIONER GARNER:**  And how

39

1   about Rafael, where's he living now?

2         **INMATE LOPEZ:**  He still live in San

3   Francisco.

4         **PRESIDING COMMISSIONER GARNER:**  How old

5   is he now?

6         **INMATE LOPEZ:**  Twenty-five.

7         **PRESIDING COMMISSIONER GARNER:**  What's he

8   doing?

9         **INMATE LOPEZ:**  He works as a mechanic.

10         **PRESIDING COMMISSIONER GARNER:**  Okay.

11  And I know it's probably very difficult for your

12  family in Mexico, but have you had visits from

13  anyone?

14         **INMATE LOPEZ:**  My mom, she came about

15  four years ago.

16         **PRESIDING COMMISSIONER GARNER:**  So she

17  was able to come up.  So most of the contact is

18  by letters and telephone?

19         **INMATE LOPEZ:**  Yes.

20         **PRESIDING COMMISSIONER GARNER:**  And how

21  about Rafael?

22         **INMATE LOPEZ:**  By telephone, telephone.

23         **PRESIDING COMMISSIONER GARNER:**  Is he

24  married?

25         **INMATE LOPEZ:**  No, Sir.

26         **PRESIDING COMMISSIONER GARNER:**  No.

27  Okay.  All right.  Any follow-up questions?

40

1        **DEPUTY COMMISSIONER SELLWOOD:**  No, Sir.

2        **PRESIDING COMMISSIONER GARNER:**

3    Ms. Tardiff, questions?

4        **ATTORNEY TARDIFF:**  An issue that might

5    arise, after the commitment offense you were --

6    left the area and you went back to Mexico.

7    Correct?

8        **INMATE LOPEZ:**  Correct.

9        **ATTORNEY TARDIFF:**  And then you came back

10   to the United States illegally.  If you were

11   paroled, and you obviously are -- Okay.  First

12   of all, if you were paroled and INS did not pick

13   you up, would you still go back to Mexico?

14       **INMATE LOPEZ:**  Yes.

15       **ATTORNEY TARDIFF:**  Okay.  Now would you

16   ever come back into the Unites States illegally?

17       **INMATE LOPEZ:**  Never.

18       **ATTORNEY TARDIFF:**  Okay.  And why is

19   that?

20       **INMATE LOPEZ THROUGH INTERPRETER:**

21   Because they gave me that order not to come back

22   over here.  And I have learned to obey -- My

23   plans are down there.

24       **ATTORNEY TARDIFF:**  Okay.  And this ranch

25   or whatever, that's family owned?  You need to

26   answer.

27       **INMATE LOPEZ:**  That's correct.

41

1      **ATTORNEY TARDIFF:**  And how big is it?

2      **INMATE LOPEZ THROUGH INTERPRETER:**  When I

3  came here it was about 40 acres.  But I know

4  that they have bought more.

5      **ATTORNEY TARDIFF:**  Do you know how many

6  people work on the ranch?

7      **INMATE LOPEZ THROUGH INTERPRETER:**   I

8  don't have any idea right now.

9      **ATTORNEY TARDIFF:**  Okay.  Now before the

10  commitment offense, a couple of years before the

11  commitment offense, were you involved -- did

12  somebody stab you?

13      **INMATE LOPEZ:**  That's correct.

14      **ATTORNEY TARDIFF:**  Okay.

15      **INMATE LOPEZ THROUGH INTERPRETER:**  Eleven

16  times.

17      **ATTORNEY TARDIFF:**  They stabbed you 11

18  times.  And that was -- you were trying to break

19  up a fight?

20      **INMATE LOPEZ:**  That's correct.

21      **ATTORNEY TARDIFF:**  Okay.  And you almost

22  died.

23      **INMATE LOPEZ:**  I almost died.

24      **ATTORNEY TARDIFF:**  Did you -- And did you

25  ever get any kind of counseling or anything to

26  help you with that, what happened?

27      **INMATE LOPEZ:**  No.

42

1       **ATTORNEY TARDIFF:**  So since the time that

2  you were stabbed, were you fearful when you were

3  out in the public?

4       **INMATE LOPEZ THROUGH INTERPRETER:**  Yes,

5  of course, yes.  I lived scared.

6       **ATTORNEY TARDIFF:**  So is that -- do you

7  think that had something to do with how you

8  perceived what was happening when you killed the

9  individual, were you maybe overreacting because

10  of the fear of the stabbing that you received?

11       **INMATE LOPEZ THROUGH INTERPRETER:**  Part

12  of that (indiscernible) fearful (indiscernible)

13  to live (indiscernible) and upset.

14       **ATTORNEY TARDIFF:**  So how have you gotten

15  rid of that fear or whatever?

16       **INMATE LOPEZ THROUGH INTERPRETER:**  Thanks

17  to AA programs and give my life to Jesus.

18       **ATTORNEY TARDIFF:**  So that's helped you

19  deal with the fear you had at the time of the

20  crime from the stabbing?

21       **INMATE LOPEZ:**  (Indiscernible).

22       **ATTORNEY TARDIFF:**  How though?

23       **INMATE LOPEZ THROUGH INTERPRETER:**  I know

24  what's the feel or combustible that feeds the

25  anger

26       **INMATE LOPEZ:**  Anger.

27       **INMATE LOPEZ THROUGH INTERPRETER:**  --

43

1   which is jealousy and insecurity (indiscernible)

2   forgiveness.  Now I do the contrary.

3         **ATTORNEY TARDIFF:**  In terms of -- Do you

4   have plans to participate in AA in Mexico?

5         **INMATE LOPEZ THROUGH INTERPRETER:**  Of

6   course, yes.

7         **ATTORNEY TARDIFF:**  And what are those

8   plans?

9         **INMATE LOPEZ THROUGH INTERPRETER:**  The

10   plans are to start something in the community.

11   I have my godfather waiting for me with

12   literature.

13         **ATTORNEY TARDIFF:**  Okay.  And when you

14   say your godfather, your real godfather?

15         **INMATE LOPEZ:**  No, my sponsor.

16         **ATTORNEY TARDIFF:**  Your sponsor.

17         **INMATE LOPEZ:**  Sponsor, that's correct.

18         **ATTORNEY TARDIFF:**  Okay.  Your AA

19   sponsor?

20         **INMATE LOPEZ:**  Yes.

21         **ATTORNEY TARDIFF:**  And you still

22   communicate with your AA sponsor?

23         **INMATE LOPEZ:**  Once in awhile, yes.

24         **ATTORNEY TARDIFF:**  So you're going to

25   start an AA program in your community?

26         **INMATE LOPEZ:**  (Indiscernible) yes.

27         **ATTORNEY TARDIFF:**  Good.  Okay.  I don't

44

1    have any other questions.

2         **PRESIDING COMMISSIONER GARNER:**  Okay.

3    You want to go ahead and close.

4         **ATTORNEY TARDIFF:**  Thanks.  In terms of

5    Mr. Lopez's -- Well, first of all, I definitely

6    think Mr. Lopez is suitable.  I thought he was

7    suitable a couple of years ago when I

8    represented him.  His pre-incarceration history

9    is very favorable.  He came from an intact

10   family.  He worked hard, earned good money, had

11   a family, graduated from high school in Mexico,

12   had three years of college.  Obviously he came

13   in illegally, but we all know why they do that,

14   to better themselves.  And he did a good job on

15   bettering himself in terms of his employment,

16   etcetera.  So the blemish, which I realize is

17   more than a blemish, I think some psych used

18   that yesterday, a blemish, was this commitment

19   offense.  Since then he has not displayed any

20   evidence of violence.  He's received one

21   administrative 115 for not having headphones.

22   That's an -- He hasn't even received a 128.  He

23   has totally participated in programming.  He's

24   received his GED here in the United States as

25   well as since he's been incarcerated.  He does

26   have a -- completed the auto mechanics in '99.

27   PIA definitely gives him marketable skills.

45

1   Four years electrician, marketable skills.  We
2   know his attendance in AA has been exemplary,
3   plus his own work on the book reports regarding
4   staying clean and sober.  He attends three
5   groups a week involving the 12-steps.  Currently
6   he's able to maintain stable social
7   relationships with his family and the community.
8   He's got an AA sponsor in Mexico that he'll be
9   in the same community with on parole.  He has
10  strong family, social ties.  In terms of the
11  commitment offense, he did have an insignificant
12  criminal history as a mitigating factor.  I
13  would also like to submit he was, I think, under
14  some sort of chronic stress from the stabbing
15  that took place two years prior when he was
16  definitely a victim and he almost died as a
17  result of that.  Never did get any counseling to
18  help deal with that, and not an excuse for what
19  he did, that's for sure, and in fact he doesn't
20  even bring it up.  But I submit that I think
21  that that was probably always in back of his
22  mind.  If I were stabbed 11 times and didn't get
23  any counseling, I might feel a little jumpy
24  myself.  His psych evals have been very
25  supportive of release.  And they have been for
26  the past 13 years.  Just briefly, and I'd like
27  to also add while at the beginning he did not

46

1   acknowledge his culpability in the crime, but he

2   has done so since the late '80s, so it's been a

3   long time since he's really dealt with his -- In

4   December of '92, that was for the '93 hearing,

5   it states:  "Due to a lack of criminal history

6   and propensity towards violence, along with his

7   improvements while in prison, his potential for

8   violence is below average in a less controlled

9   setting."  Ninety-four of December, if released,

10  he should be able to maintain his gains,

11  considered for parole, dangerousness should be

12  less than for the average inmate.  And they only

13  made assessments in comparison to inmate

14  population, not the free community.  In January

15  of '95, Dr. Bakeman, B-A-K-E-M-A-N, stated:

16          "I have gotten to know him a

17          little because he works for the

18          chaplain where I often hold

19          meetings.  He seems like a very

20          sincere and reformed young man.

21          If released, he should be able to

22          maintain these gains.  If he's

23          considered for parole,

24          dangerousness -- less than for the

25          average inmate."

26  And that goes into his insight and judgment

27  appear to be much improved over that time of

47

1   using drugs prior to his incarceration.   In '97

2   he also received a very favorable psych eval.

3   Social skills make him a very -- make a very

4   positive --

5          "His social skills make a very

6          positive impression.  His insight

7          and judgment appear very

8          appropriate and well developed,

9          especially compared to his

10          youthful alcohol days.  He appears

11          to be very remorseful.  My

12          professional opinion is that

13          inmate Lopez represents a low risk

14          to the public compared to other

15          inmates with a history of

16          violence.  He continues to give no

17          indication of any serious

18          psychiatric disorder."

19   In December of '98, his insight and judgment are

20   very adequate in relation to his commitment

21   offense, continues to display apparently sincere

22   and deep remorse for his actions.  Under the

23   summary it states:

24          "Inmate Lopez has completed

25          another year of very successful

26          programming and the analysis and

27          recommendations of his last

48

1          psychological evaluation are still

2          valid and appropriate.  He simply

3          needs to remain disciplinary-free

4          and continue with relevant

5          self-help groups."

6    And for Mr. Lopez the relevant self-help are

7    obviously the 12-step programs he's participated

8    -- If released to the community, he would

9    probably -- probably would represent a low risk

10   of danger.  In the '99 psych eval states:

11         "Overall it would appear that he

12         can function well on his own and

13         become a productive member of

14         society.  Mr. Lopez for all

15         intents -- intent and purposes

16         appears to be sincerely remorseful

17         for the life that he had taken as

18         well as the injury that occurred

19         as a result of his anger and lack

20         of control.  It also appears that

21         he has matured and has taken

22         complete responsibility for his

23         actions.  He has become an

24         independent thinker and appears to

25         have learned from his previous

26         mistakes.  He has developed

27         additional coping skills as noted

49

1          by his avoidance of violence while

2          incarcerated, as well as succeeded

3          in a number of tasks as indicated

4          by the number of positive reports

5          from prior supervisors.  If

6          released to the community, there

7          would be no major difficulties

8          which would prevent him from

9          becoming a productive member of

10         society.  He has taken advantage

11         of various self-help groups in

12         dealing with substance abuse

13         recovery, maintains an ongoing

14         relationship with an outside

15         sponsor whom he contacts every

16         couple of weeks."

17    And in '03 we know he got a good psych.  I'd

18    like to just add this as well, it states that:

19         "His current level of insight and

20         judgment in general and

21         specifically regarding his

22         commitment offense is good and

23         supports a positive prediction of

24         successful adaptation to community

25         living.  He accepts full

26         responsibility for the death of

27         the victim."

50

```
 1   Goes into insightfully how he was harboring
 2   significant anger from having been stabbed
 3   almost to death a couple of years prior,
 4   appeared generally remorseful, fully understands
 5   the damage done to the victim and the family.
 6   The positive factors under assessment of
 7   dangerousness, the bulk of the evidence leans
 8   heavily towards a prediction of low risk for
 9   future violence.  He has a strong positive
10   developmental history both in social achievement
11   and academic achievement, good pre-incarceration
12   work history, no juvenile criminal history and
13   no gang involvement, no history of violent
14   behavior other than the instant offense.  Goes
15   into the -- his disciplinary history.  Under the
16   two risk assessments, the HCR-20 indicates a low
17   risk for future violence.  Under the HARE
18   psychopathy checklist, suggests the non-presence
19   of sociopathy.  Additionally, his behavior has
20   shown good programming.  He showed good
21   understanding of the factors resulting in the
22   death of the victim and seemed genuinely
23   penitent.  The instant offense does appear to be
24   a single event only.  And his potential is
25   considered to be low, the lowest level that can
26   reason -- can be reasonably estimated.  And I
27   know they added that the lowest level that can
```

51

1  be, because there was an issue at that time if

2  low -- that was taken as being negative by some

3  of the Board members. (Indiscernible) they

4  thought it should say none. So then the psychs

5  were asked to explain what they meant by low and

6  they were saying you can't get any lower than

7  lower. His Board reports up until I think it

8  was August of '04 were making assessments of

9  dangerousness. Since 2000, we have 2000, 2001,

10  2002, 2003, he received a low degree of threat

11  from his counselors. Just a couple of brief.

12  In September of '03 the counselor wrote:

13  "During the interview I noted Lopez to be very

14  upset with tears in his eyes when he spoke of

15  the victim's family and his own." In 2000 it

16  concluded:

17       "Considering the commitment

18       offense, prior record and prison

19       adjustment -- adjustment, this

20       writer believes that -- prisoner

21       would pose a low degree of threat

22       to the public at this time if

23       released from prison. He has been

24       a model inmate and has positively

25       programmed through all his years

26       of incarceration. He has gone

27       farther by being helpful and

52

1          caring towards his fellow inmates.
2          I believe that his success on
3          parole obviously will -- will
4          depend on his abstinence from
5          alcohol."
6    And in terms of the risk factor that's been
7    noted, I think anybody who's a recovering
8    alcoholic/addict, there is always that risk
9    factor that you have that there.  You're
10   recovering.  You're not cured of being an
11   alcoholic and that's always going to be a risk
12   factor.  I believe that because he has such a
13   long history of positive psychs, that the '03 is
14   certainly still absolutely applicable to today's
15   hearing, a new psych eval would not change
16   anything.  I know I'm not a psychologist, but
17   there's nothing to indicate any behavior to give
18   him less than what he's had for the past 13
19   years.  His parole plans are positive.  I
20   believe he's served enough time for the crime.
21   Last time basically he was denied based on the
22   commitment offense alone.  I'm not sure, you
23   know, I don't think that that's a valid -- that
24   does not indicate that he would pose a risk to
25   society based on the commitment offense alone.
26   There's no other evidence to show that he would
27   be violent.  And I submit it on that.  Thank

53

1   you.

2        **PRESIDING COMMISSIONER GARNER:**  Thank

3   you.  Mr. Lopez, this is your opportunity to

4   address the Panel regarding why you feel you're

5   suitable for parole.  And if it would be easier

6   for you to do it in Spanish, that's okay.

7        **ATTORNEY TARDIFF:**  Can I just interrupt

8   for a minute.  Did you get this Anger Management

9   that he got in '05 since his last --

10       **DEPUTY COMMISSIONER SELLWOOD:**  I believe

11  I mentioned --

12       **ATTORNEY TARDIFF:**  -- hearing?

13       **DEPUTY COMMISSIONER SELLWOOD:**  -- the

14  Anger Management.

15       **ATTORNEY TARDIFF:**  Yeah.

16       **DEPUTY COMMISSIONER SELLWOOD:**  It was the

17  video class?

18       **ATTORNEY TARDIFF:**  No, it's 12 weeks.

19       **DEPUTY COMMISSIONER SELLWOOD:**  That's the

20  12-week one.

21       **ATTORNEY TARDIFF:**  Yeah.

22       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  I

23  don't know that I have -- Okay.

24       **INMATE LOPEZ THROUGH INTERPRETER:**  First

25  of all I want to thank you for all the things

26  that we've talked about.  Personally I feel a

27  lot of pain for causing the death of

56

1   participation in education programs and the

2   Panel noted that although you had a high school

3   diploma from Mexico you took advantage of the

4   opportunity here and achieved a GED while

5   incarcerated.  That you've participated in

6   self-help programs.  The Panel noted and to your

7   credit that you've not only done one program

8   with respect to the alcohol issues, that you've

9   actually done three in a long sustained manner.

10  And that included the 12-Step program and

11  multiple other AA programs occurring on

12  different nights of the week.  So far as your

13  vocational programs, you did get the vocational

14  certificate in auto mechanics and you also have

15  had institutional job assignments that will

16  provide you opportunities for marketable skills

17  upon your parole.  And that includes the time

18  you spent as an electrician, the time that you

19  were in the carpentry and then also the fact

20  that you're now working as a porter with one of

21  the chaplains.  The Panel noted that the offense

22  could have been committed as a result of

23  significant stress in your life and the

24  indication was that there was a life threatening

25  knife attack that you had previously suffered,

26  that you lacked a significant criminal history

27  **JESUS LOPEZ    D-37180    DECISION PAGE 2    8/10/06**

57

1    of violent crime.  This essentially was your

2    only crime.  You were arrested in Texas on your

3    way back from Mexico but the essential crime was

4    the commitment offense.  Because of your

5    maturation, growth and a greater understanding

6    and your advanced age the probability of

7    recidivism is reduced.  You're substantially

8    older than when you came in, but you're still a

9    young man.  You got a lot -- a lot of life left.

10   You've got realistic parole plans.  They include

11   a job offer and family support.  We know that

12   the family ranch in Mexico is waiting for you.

13   You have other marketable skills if that doesn't

14   work out or at some point the ranch is no longer

15   to -- to your liking.  We also noted that you've

16   got substantial support by virtue of letters.

17   We also noted and reviewed the prior transcript

18   and volumes of letters that were submitted for

19   the hearing of June 10, 2005.  That you've

20   maintained close family ties while in prison via

21   letters, visits and telephone calls.  And again,

22   you noted today that despite the distance your

23   mother was able to visit you here within the

24   last few years.  That you've maintained positive

25   institutional behavior, which indicates a

26   significant improvement in self-control, and to

27   **JESUS LOPEZ    D-37180    DECISION PAGE 3    8/10/06**

58

1    your credit you have only one 115. This was in

2    1988 and it was for the offense of not wearing

3    earphones with your radio. Certainly it doesn't

4    come up on the level of violence to any degree

5    at all. That you've shown signs of remorse,

6    that you indicate you understand the nature and

7    magnitude of the offense. You've accepted the

8    responsibility for your criminal behavior and

9    you've demonstrated a desire to change toward

10   good citizenship. These demonstrations have

11   occurred in the evaluations that have been done

12   by the psychologists, the comments that have

13   been made in the Board reports and the comments

14   that were made at today's hearing. The Panel

15   concluded, excuse me. The Panel considered two

16   psychological exams. The first one being

17   September of 2003 by Dr. Reed. Dr. Reed

18   concludes in one portion of the report that you

19   appear genuinely remorseful for your crime. You

20   understand fully the damage that was done to the

21   victim and the family and you appear to be fully

22   aware how your anger, fearfulness and

23   potentially -- in a potentially dangerous

24   situation and possession of a handgun and being

25   under the influence of alcohol, those were all

26   factors that led to the death of the victim and

27   **JESUS LOPEZ   D-37180   DECISION PAGE 4   8/10/06**

62

1   influence of alcohol in your life prior to and

2   at the time of the commitment offense.  Another

3   thing the Panel's going to ask you to consider

4   and that would be after seeking legal advice is

5   that if you truly do intend to return to Mexico

6   that you consider signing a waiver not to fight

7   extradition.  But I would encourage you to do

8   that after getting legal advice.  Commissioner,

9   anything you want to put on the record?

10          **DEPUTY COMMISSIONER SELLWOOD:**  Thank you,

11   no.

12          **PRESIDING COMMISSIONER GARNER:**  All

13   right.  It's 11:06.  Good luck, sir.

14          **INMATE LOPEZ:**  (Indiscernible).

15          **PRESIDING COMMISSIONER GARNER:**  That

16   concludes this hearing.

17                      --oOo--

18

19

20

21

22

23   **PAROLE GRANTED**                    **DEC** 18 2006

24   **THIS DECISION WILL BE FINAL ON** _____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **JESUS LOPEZ   D-37180   DECISION PAGE 8   8/10/06**

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 62, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JESUS LOPEZ, CDC No. D-37180 on AUGUST 10, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 25, 2006 at Sacramento County, California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

# EXHIBIT

# "III"

GOVERNOR.                          DURANGO, DGO, MEXICO
                                        NOV. 3 of 2006


AS CNE OF THE MEMBERS OF THE ALCOHOLICS ANONYMOUS
HERE IN DURANGO, MEXICO, I LET YOU KNOW THAT I'M
HERE TO SUPPORT THE FREEDOM OF MR. JESUS LOPEZ, D-37180

I'M DISPOSEABLE TO PROPORTION TO HIM ALL KIND OF ORIENTATION
AND LITERATURE TO MAKE POSSIBLE HIS PERMANENCY IN
ALCOHOLICS ANONYMOUS. HIS SOBRIETY WILL HELP HIM TO
INGRESS INTO THE SOCIATY AND HIS FAMILY.

SUCH AS MR. JESUS LOPEZ THERE ARE MANY SICK
ALCOHOLICS THAT WE HAD ANOTHER OPPORTUNITY, SO
WE DID NOT DESPISE IT, AND NOW WE ARE VERY
USEFUL FOR THE SOCIATY AS WELL FOR OUR LOVEONES.

    I HOPE YOU'LL FIND FAVOR IN MY PETITION, I
SALUTE YOU IN A VERY RESPECTFUL MANNER.


                    ATTENTIVELY
                      SIGNATURE
                        NAME
TELEPHONE: 618-813-6445

Durango, Dgo. Nov. 3 de 2006

**GOVERNOR**
**ARNOL SCHWARZENEGGER**
**STATE CAPITOL**
**SACRAMENTO, CA. 95814-4991**

Como un miembro mas de alcohólicos anónimos aquí en Durango México comunico a usted que para apoyar y contribuir a la liberación del Sr. Jesús López, D-37180 estoy dispuesto a proporcionarle toda la literatura y orientación para hacer posible su permanencia en alcohólicos anónimos y su sobriedad para que se integre a la sociedad y a su familia.

Como el Sr. Jesús López habemos muchos enfermos alcohólicos que tuvimos otra oportunidad y la supimos aprovechar y hoy somos útiles a la sociedad y a nuestros seres queridos.

Esperando vernos favorecidos en mi petición, lo saludo respetuosamente.

**ATENTAMENTE**

Juan Esteban Sánchez Cassio

Pedro Avila Nevarez
Federal Delegate for the
State of Durango, Mexico

TO:  Very Respectful Governor
     Mr. Schwarzenegger


I have been informed that Mr. Jesus Lopez, D37180, has been found eligible for parole, to be deported to our country, specifically, our State of Durango, where his family and his mother currently reside. This decision was made by the Board of Parole Hearings on 08-10-06, at Soledad State Prison (CTF).

Various distinctive agencies of the Mexican Government have notified me in my position as a Federal Delegate for the State of Durango, from where Jesus Lopez, D37180 is originally, that Jesus Lopez forms part of the Republic of Mexico. Also, we have sent various reports and other materials such as: Letters of Recommendation of good conduct, as well as reports, where he rendered his services in an honorable and efficient manner, the same documents that were revised by the Board of Parole Hearings.

We are all interested in his liberty, being that we know of his good behavior, and in which he finds himself completely rehabilitated.

My conclusion (official and personal) is that I am convinced that our native son Mr. Lopez does not present a risk to our public safety. I express honesty and give my complete support to the decision made by the respectable personnel of the Board of Parole Hearings. I adhere to said decision to concede Mr. Lopez his liberty.

His wishes and his plans, as indicated above, after obtaining his freedom are to return to our State of Durango, Mexico and work a small ranch which his mother owns. Also, he needs to assist in the rehabilitation programs of Alcoholics Anonymous which we have in our state. He has and will have all the necessary support that he will need to restart his life.

I understand that as a governor you have the final word to sign with the compassion that has always characterized you. Taking into account the case of Jesus Lopez, D37180, who has served a lengthy term of 21 years in which he has demonstrated his willingness to rehabilitate, to which the Board of Parole Hearings has determined and given their approval for his release.

That said, I appeal to your generosity, your benevolence, and your high spirit of justice, which is well known in our country. I ask you with all due respect to grant Mr. Jesus Lopez, D37180, his freedom.

We assure you that Mr. Jesus Lopez will no longer be delinquent. Also, we promise you that you will not be defrauded in granting our Mexican National his liberty, as he wishes to return to his country to work and support his mother.


Attentively



(On 11-21-06 this letter was translated from Spanish to English)

*Pedro Avila Nevarez*
DIPUTADO FEDERAL
POR EL ESTADO DE DURANGO

**GOVERNOR ARNOLD
SCHWARZENEGGER
STATE CAPITOL
SACRAMENTO, CA
95814-4991**

Muy respetable governador
SR. SCHWARZENEGGER:

Se me a informado que el *SR. JESÚS LÓPEZ, D37180, se le encontró elegible para estar en libertad y ser enviado a nuestro país, y por ende a nuestro estado de Durango. donde tiene a sus familiares principalmente a su madre del que es el único sostén, esta decisión fue hecha por (BOARD OF PAROLE HEARING), Junta Directiva de Prisiones en California en la Fecha 10 de Agosto 2006, en la prisión "SOLEDAD STATE PRISON, CTF."*

De distintas dependencias del gobierno Mexicano y yo en mi calidad de Diputado Federal por el Estado de Durango, de donde JESÚS LÓPEZ D37180, es originario y que forma parte de la República Mexicana, como también se han enviado reportes de otros materiales entre estos cartas de recomendación, de buena conducta, y del trabajo donde él prestaba sus servicios en una forma honrada y eficiente. Los mismos documentos que fueron revisados por la BOARD OF PAROLE HEARINGS. (Junta Directiva de Prisiones). Ya que todos estamos interesados en su libertad porque sabemos de su buen comportamiento y que ya se encuentra totalmente rehabilitado.

*Mi conclusión (oficial y personal de esto) es que estoy convencido de que nuestro paisano el SR. LÓPEZ, no representa un riesgo para la seguridad pública. Yo alabo honestamente y doy mi total apoyo a la decisión hecha por el respetable personal de BOARD OF PAROLE HEARINGS, y me adhiero a dicha decisión de concederle su libertad al SR. LÓPEZ.*

Él desea y sus planes como ya lo dije en líneas arriba que tiene planeado ahora que obtenga su libertad de regresar a nuestro estado de Durango, México y trabajar en un pequeño rancho que tiene su madre y continuar asistiendo para su rehabilitación a los programas de Alcohólicos Anónimos que hay en nuestro estado. Él tiene y tendrá todo el apoyo que necesita para rehacer su vida.

Yo entiendo que Usted como gobernador tiene la ultima palabra para firmar con el gran corazón que siempre lo ha caracterizado y teniendo en cuenta que en este caso JESUS LÓPEZ D37180, ya ha compurgado una larga condena de 21 años durante los cuales a demostrado su deseo de rehabilitación misma que la Junta Directiva de Prisiones ha estudiado detenidamente y ha dado su aprobación para que obtenga su libertad por ello apelando a su generosidad y a su benevolencia y a su alto espíritu de justicia bien conocido en nuestra patria yo le pido muy respetuosamente firmar la libertad de JESÚS LÓPEZ D37180, ya que el no volverá a delinquir y le aseguramos que Usted no será defraudado al concederle la libertad a este mexicano que desea volver a su patria para trabajar y mantener a su madre.

ATENTAMENTE
Victoria de Durango, Dgo. Agosto 4 del 2006



AV. CONGRESO DE LA UNION Nº 66 COL. EL PARQUE, C. P. 15960 MEXICO, D. F.
EDIFICIO "B" NIVEL 4, TELS. 5628-1434, 5628-1300 EXT. 3543 FAX: 3535
OFIC. EN DURANGO, DGO. CARLOS LEON DE LA PEÑA 516, ZONA CENTRO, C.P. 34000, DGO.
TEL. OFICINA DURANGO: (016188) 11 7588

# EXHIBIT

# "IV"



# OFFICE OF THE GOVERNOR

January 5, 2007

***Via Facsimile and U.S. Mail***

Mr. Jesus Lopez, D-3 /180
***Correctional Training Facility***
East Dorm – 76U
Post Office Box 686
Soledad, California 93960

Dear Mr. Lopez:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to <u>reverse</u> the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

LOUIS MAURO
Chief Deputy Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

### JESUS LOPEZ, D-37180
### SECOND-DEGREE MURDER

**AFFIRM:** _____

**MODIFY:** _____

**REVERSE:** _____X_____

On October 26, 1983, Jesus Lopez fired his .32 caliber pistol multiple times while inside a bar, killing Robert Barajas and wounding Guadalupe Olmedo.

According to the probation report, at approximately 1:45 a.m., San Francisco police officers responded to reports of a shooting at a bar. When officers entered the establishment, they found Robert and Guadalupe lying on the ground, each with multiple bullet wounds. Witnesses said that three individuals (one later identified as Jesus Lopez) entered the bar and began drinking beer. Jesus said later in statements during his 2006 parole hearing that while he was at the bar he had an argument with Robert. Jesus went to get his loaded .32 caliber pistol from his car and returned to the bar. According to the probation report, Jesus shot Robert, who was sitting on a barstool. Robert fell off the barstool and onto the floor, at which point, according to a witness, Jesus fired again. Guadalupe was present during the shooting and she was shot multiple times and wounded. Robert received four gunshot wounds and died from his injuries. Jesus told the 2006 Board that he did not know Robert or Guadalupe before he went to the bar that night.

When he perpetrated the life offense, Jesus Lopez was 23 years old and had no prior criminal record. He was apprehended almost two years later, when he was arrested for — and ultimately convicted of — smuggling illegal immigrants from Mexico into the United States. Following a court trial for the life offense, Mr. Lopez was convicted of second-degree murder and assault with a deadly weapon, both convictions enhanced for use of a firearm. He was sentenced to a term of life in prison with the possibility of parole for murder, plus a consecutive two-year enhancement for use of a firearm. He was also sentenced to a concurrent five-year term for assault with a deadly weapon with use of a firearm. During his incarceration for the life offense, Mr. Lopez was disciplined one time, in 1988, for playing a radio without headphones.

I have considered various positive factors in reviewing whether Mr. Lopez is suitable for parole at this time. In addition to remaining discipline-free for more than 18 years, Mr. Lopez made efforts during his incarceration to enhance his ability to function within the law upon release. He earned his GED in 1991 and completed various basic education, disease prevention, English-as-a-Second Language and bible study courses. He also completed a computer training program and received employment training pertaining to hazardous materials. In addition, he completed vocational training in auto mechanics and received additional training in small engine repair. He

Jesus Lopez, D-37180
Second-Degree Murder
Page 2 of 3

worked institutional jobs such as teacher's assistant, chapel clerk, tier tender, culinary cook, carpenter, porter and tutor. He also worked in plant operations as an electrician's assistant and in prison industry as a furniture finisher and machine operator. He availed himself of an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Life Skills, Inmate Employability Program, Staying Sober Program, Kairos, Amer-I-can, Alternatives to Violence, Life Plan for Recovery, Fatherhood and Anger Management, Rapha 12 Step Program, Hands of Peace, Creative Conflict Resolution, Convicts Reaching Out to People and Impact Program. Mr. Lopez maintains seemingly supportive relationships with family and friends and he received some positive evaluations from mental-health and correctional professionals over the years.

Regarding his plans for parole, Mr. Lopez made no residential or employment plans in San Francisco County, his county of last residence, or anywhere else in California. Nevertheless, Mr. Lopez is subject to deportation to Mexico upon release, and he reportedly made plans in Mexico to live with his mother and work on a family ranch.

Despite the positive factors I have considered, the second-degree murder for which Jesus Lopez was convicted was especially grave, because it involved multiple victims, it involved some level of premeditation when Jesus left the bar and returned with a loaded gun, and the manner in which he committed the life offense — shooting Robert Barajas and Guadalupe Olmedo multiple times and then fleeing the scene — demonstrated an exceptionally callous disregard for human suffering and life. In addition, the motive for the crime was trivial in relation to the offense. It appears Robert presented no immediate threat to Jesus. According to the probation officer, "[t]his must be considered a most frustrating case in that the motivation for this vicious killing of one person and shooting of another is not apparent. Review of police reports and interviews with the defendant indicate that this tragedy occurred as a result of a possible argument over a bottle of beer or some rather obscure issue. As noted under the defendant's statement, he states he cannot remember what happened. Statements by witnesses indicate that there was no valid or reasonable provocation for such a serious response." During sentencing proceedings, the judge said, "I still have yet to figure out a motive for this, but I do have somebody who was shot, was murdered, and I have got an innocent - - well, I say both of them were innocent because I don't know why the first killing took place." Jesus had numerous opportunities to stop during this crime — after leaving the bar, after retrieving his gun, after returning to the bar, after approaching Robert, and after each of the numerous gunshots he fired — yet he chose to continue. According to the probation report, Robert was shot in the right chest, the midline of the neck, the abdomen and below his right ear. Guadalupe Olmedo was also shot multiple times. Jesus' actions also exposed additional people to the risk of death or serious injury. The probation report noted that several people were present during the shooting. The gravity of the second-degree murder committed by Jesus Lopez is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

In finding Mr. Lopez suitable for parole, the 2006 Board said "the offense could have been committed as a result of significant stress in your life and the indication was that there was a life threatening knife attack that you had previously suffered . . . ." But even if Mr. Lopez was under

Jesus Lopez, D-37180
Second-Degree Murder
Page 3 of 3

stress when he perpetrated the life offense, I believe that factor, by itself, is presently insufficient to mitigate the nature and circumstances of the murder he committed.

At age 46 now, after being incarcerated for more than 21 years, Mr. Lopez says he accepts responsibility and is remorseful for his actions. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Lopez presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Lopez.

Decision Date: 12/21/2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

**ENDORSED**                    OCT 2 4 2007
**FILED**
*San Francisco County Superior Court*    GORDON PARK-LI, Clerk    **ENDORSED**

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

ENDORSED
F I L E D
**San Francisco County Superior Court**

OCT 2 4 2007

GORDON PARK-LI, Clerk
Superior Court of California, County of San Francisco

OCT 2 4 2007

BY _____

ENDORSED
F I L E D
**San Francisco County Superior Court**

OCT 2 4 2007

OCT 2 4 2007

GORDON PARK-LI, Clerk
BY: ___JACQUES KHOROZIAN___
                    Deputy Clerk

DEPUTY CLERK

GORDON PARK-LI, Clerk
BY: ___JACQUES KHOROZIAN___
                    Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE CITY AND COUNTY OF SAN FRANCISCO

Department No. 22

IN THE MATTER OF THE APPLICATION )
OF                                                    )
                                                         )     WRIT NO. 5495
                                                         )
JESUS LOPEZ                                   )     (1st Dist. Court of Appeal
                                                         )     Writ of Mandate A118661)
Petitioner,                                       )
                                                         )
FOR A WRIT OF HABEAS CORPUS    )
                                                         )
_____)

## Background

A petition for writ of habeas corpus (#5495) was received
and filed in this court on January 22, 2007.  The petition was
assigned for review, pursuant to normal court procedure.  It
was apparently misplaced some time after this, since the court
became aware in August that no order had issued and the
petition could not be found.

The court has since obtained a copy of the petition,
which was attached as exhibit "C" to Petitioner's motion for
an order to show cause filed in the Court of Appeal.  The

1  Court of Appeal issued a peremptory writ of mandate ordering
2  this court to issue an opinion on the petition within 30 days
3  of September 25, 2007.

### Opinion and Order

5      Petitioner is currently incarcerated in the Correctional
6  Training Facility, Soledad, California.  Petitioner was convicted
   of second-degree murder with a firearm on July 16, 1986. Petitioner
7  was sentenced to seventeen years to life.

8      On August 10, 2006, the Board of Parole Hearings ("the Board")
9  granted Petitioner a parole date.  In a decision dated December 21,
10 2006, Governor Schwarzenegger reversed the Board's decision
   granting parole.
11

12     Petitioner contends that:  1) the Governor's reversal of
   parole must be overturned because the Governor's jurisdiction to
13 review the Board's decision terminated on December 8, 2006; and, 2)
14 the Governor's reversal of the Board's decision is in error because
15 it is not based on "some evidence" that Petitioner would pose a
   risk to public safety if released.
16

17     I.    THE COMMITMENT OFFENSE

18     The facts of the commitment offense were recited in the
   Governor's decision as follows:
19

20         According to the probation report, at approximately
           1:45 a.m., San Francisco police officers responded to
21         reports of a shooting at a bar.  When officers entered
           the establishment, they found Robert and Guadalupe lying
22         on the ground, each with multiple bullet wounds.
           Witnesses said that three individuals (one later
23         identified as Jesus Lopez) entered the bar and began
           drinking beer.  Jesus said later in statements during his
24         2006 parole hearing that while he was at the bar he had
           an argument with Robert.  Jesus went to get his loaded
25         .32 caliber pistol from his car and returned to the bar.

2

1    According to the probation report, Jesus shot Robert, who
     was sitting on a barstool.  Robert fell off the barstool
2    and onto the floor, at which point, according to a
     witness, Jesus fired again.  Guadalupe was present during
3    the shooting and she was shot multiple times and wounded.
     Robert received four gunshot wounds and died from his
4    injuries.  Jesus told the 2006 Board that he did not know
     Robert or Guadalupe before he went to the bar that night.
5

6    **II.   THE GOVERNOR DID NOT ACT IN EXCESS OF HIS JURISDICTION
         WHEN HE REVERSED THE BOARD'S GRANT OF PAROLE**

7
          Petitioner is incorrect in his contention that the Governor's
8    power to review the Board's decision expired on December 8, 2006.

9
          "During the 30 days following the granting... by a parole
10   authority of the parole of a person sentenced to an indeterminate
11   prison term based upon a conviction of murder, the Governor, when
12   reviewing the authority's decision pursuant to subdivision (b) of
     Section 8 of Article V of the Constitution, shall review materials
13   provided by the parole authority." (Cal. Pen. Code § 3041.2.)

14
          Any proposed decision granting, modifying, or denying a parole
15   date for a life prisoner, exclusive of those made during Progress
16   Hearings, shall become final no later than 120 days after the
17   hearing at which the proposed decision was made. (Cal. Code Regs.,
18   tit. 15, § 2043.) The Governor's authority to review a parole
     decision commences on the effective date of the Board's decision.
19   (In re Arafiles (1992) 6 Cal.App.4th 1467, 1474.) In Petitioner's
20   case, the effective date of the Board's decision was 120 days from
21   the date parole was granted, or December 8, 2006.

22        The Governor had 30 days commencing on December 8, 2006, in
     which to review and act upon the parole decision. Thus, the
23   Governor had until January 8, 2007, to review the Board's decision.
24   The record shows the Governor made his decision on December 21,

25

3

1    2006, and the cover letter was dated on January 5, 2007.  The
2    Governor's decision was timely.

3        **III. THE GOVERNOR'S REVERSAL WAS SUPPORTED BY SOME EVIDENCE**

4        The Governor relied on the commitment offense in determining
5    Petitioner was unsuitable for parole.  The Governor found that
     Petitioner's offense was "especially grave" because it involved
6    multiple victims, it involved "some level of premeditation," and
7    the manner in which the offense was committed demonstrated a
8    "callous disregard for human suffering and life."  Additionally,
9    the Governor found that the motive for the crime was trivial in
     relation to the offense, and that Petitioner's actions also exposed
10   additional people to the risk of death or serious injury, because
11   several people were present during the shooting.

12       The Governor found that "even if [Petitioner] was under stress
13   when he perpetrated the life offense, I believe that factor, by
14   itself, is presently insufficient to mitigate the nature and
     circumstances of the murder he committed."
15

16       **A.    Standard of Review**

17       The Board "shall normally set a parole release date" one year
     prior to an inmate's minimum eligible parole release date. (Cal.
18   Pen. Code § 3041(a).)  However, before the Board sets a release
19   date, it must determine whether the prisoner poses an unreasonable
20   risk to society.  (Cal. Pen. Code § 3041(b); Cal. Code Regs., tit.
21   15, § 2402; In re Dannenberg (2005) 34 Cal.4th 1061, 1086.)

22       In determining whether an inmate poses an unreasonable risk to
23   society, the Board (or Governor) must consider all relevant
     information, including the inmate's social history, criminal
24   record, the commitment offense itself, the inmate's behavior after
25   incarceration, and the inmate's parole plans.  (Cal. Code Regs.,

4

1  tit. 15, § 2402.)  Factors tending to show a prisoner is unsuitable
2  for parole include an especially heinous and callous commitment
3  offense, a previous record of violence, an unstable social history,
   and poor conduct in prison.  (Cal. Code Regs., tit. 15, § 2402(c).)
4
5      The question before the reviewing court is "not whether some
   evidence supports the reasons. . . cite[d] for denying parole, but
6  whether some evidence indicates a parolee's release unreasonably
7  endangers public safety." (In re Lee (2006) 143 Cal.App.4th 1400,
8  1408.)  Thus, the reviewing court must determine whether "some
   evidence" supports the finding that the prisoner poses an
9  unreasonable risk to society. (Ibid.)
10
        When a court reviews the Governor's reversal of a grant of
11 parole, it is limited to determining only whether the decision is
12 supported by "some evidence." (In re Rosenkrantz (2002) 29 Cal. 4th
13 616, 625.)  The Governor's decision to affirm, modify or reverse
   the decision of the Board must be based on the same facts which the
14 parole authority is required to consider.  (Id. at 650.)  The
15 Board's (and hence the Governor's) discretion in parole matters has
16 been described as "great" and "almost unlimited." (Id. at 655.)
17 The precise manner in which the specified factors relevant to
   parole suitability are considered and balanced lies within the
18 discretion of the Board (or Governor), but the decision must
19 reflect an individualized consideration of the specified criteria
20 and cannot be arbitrary or capricious.  (In re Van Houten (2004)
21 116 Cal. App. 4th 339, 348.)

22     As long as the Governor's decision reflects due consideration
   of the specified factors as applied to the individual prisoner in
23 accordance with applicable legal standards, the court's review is
24 limited to ascertaining whether there is some evidence in the
25

5

1  record that supports the Governor's decision.  (*Rosenkrantz, supra,*
2  29 Cal.4th at 677.)

3       **B.   *The Governor's Decision***

4       The law provides that the Board must grant parole unless it
5  determines that public safety requires a lengthier period of
6  incarceration for the individual because of the gravity of the
   offense underlying the conviction.  (*Id.* at 654.)  An inmate may
7  not be found unsuitable for parole based entirely on the commitment
8  offense if the defendant's acts were no more than the bare minimum
9  needed to commit the offense.  (*Id.* at 683.)  In his decision to
   revoke the Board's recommendation, the Governor cites the facts of
10 the commitment offense as reasons for denying parole.

11
       To be used as the primary basis for denial of parole, the
12 commitment offense must have been committed "in an especially
13 heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, §
14 2402, subd. (c)(1).) In other words, to merit parole denial on
   these grounds, the crime must involve more than the minimum
15 elements necessary to commit the crime. (*In re Rosenkrantz, supra,*
16 29 Cal.4th at page 683.)

17     To support his findings in this case that Petitioner committed
18 the commitment offense in an "especially heinous, atrocious or
19 cruel manner" the Governor must cite to aggravating factors beyond
   the minimum necessary for a conviction of second-degree murder.
20 Factors to be considered include:

21
       (A) Multiple victims were attacked, injured or killed in
22     the same or separate incidents.

23     (B) The offense was carried out in a dispassionate and
       calculated manner, such as an execution-style murder.
24

25

6

1       (C) The victim was abused, defiled or mutilated during or
        after the offense.
2

3       (D) The offense was carried out in a manner which
        demonstrates an exceptionally callous disregard for human
4       suffering.

5       (E) The motive for the crime is inexplicable or very
        trivial in relation to the offense.
6

(Cal. Code Regs., tit. 15, § 2402.)

7

8       In reversing the Board's grant of parole, the Governor found
that the second-degree murder was especially grave.  It involved
9   multiple victims, some level of premeditation (because Petitioner
10  left and returned with a loaded gun), and flight by the Petitioner
after shooting the victims multiple times, demonstrating an
11  exceptionally callous disregard for human suffering and life.

12

        In fact, the Governor observed that Petitioner "had numerous
13  opportunities to stop during this crime—after leaving the bar,
14  after retrieving his gun, after returning to the bar, after
15  approaching Robert, and after each of the numerous gunshots he
fired—yet he chose to continue."  Petitioner's firing of the gun
16  inside the bar also "exposed multiple people to the risk of death
17  or serious injury," and the motive for the shooting was trivial in
18  relation to the offense.

19      Petitioner contends that his case is similar to *In re
20  Lee* (2006) 143 Cal.App.4th 1400. In *Lee*, the defendant, Wen Lee,
sold his restaurant to Johnny Soong in return for Soong's promise
21  to make periodic payments toward the purchase price. Lee intended
22  to support his retirement from the sale proceeds. (*Id.* at 1404)
23  Soong repeatedly failed to make payments, however, causing Lee
24  hardship and forcing him to renegotiate Soong's debt a number of
25  times. (*Ibid.*) Some renegotiation meetings were heated. (*Ibid.*)

7

1 During one meeting, Soong pulled a knife on Lee, forcing Lee to
2 flee. (*Ibid.*)

3    The next time Lee visited Soong at the restaurant to collect a
4 payment, Lee went armed with a gun and box of ammunition. (*Ibid.*)
5 He had decided that, if Soong refused to pay, he would kill Soong
and then himself. (*Ibid.*) Lee entered the restaurant and asked
6 Soong for his money. (*Ibid.*) Soong shook his head and said he did
7 not have time to talk. (*Ibid.*) Lee pulled out his gun and fired
8 five times before it jammed. (*Ibid.*) He hit Soong twice, who
survived the shooting, but one of the bullets hit Soong's wife,
9 Tuai Li-Chun, in the head, killing her. (*Ibid.*)

10    Lee pleaded guilty to attempted premeditated murder of Mr.
11 Soong, second degree murder of Mrs. Soong, and two firearms
12 enhancements. (*Ibid.*) Lee received a sentence of 17 years-to-life
13 with possibility of parole. (*Ibid.*) Sixteen years later, the Board
concluded Lee was eligible for parole. (*Ibid.*) The Governor
14 reversed the Board's grant of parole, based on the commitment
15 offense and Lee's recent expression of remorse, despite Lee's
16 exemplary prison record. (*Id.* at 1404-1406.) The Governor viewed
17 Lee's acts in committing his crimes as "atrocious" and beyond the
18 "the minimum necessary to sustain" his convictions. (*Id.* at 1405.)

19    The Court of Appeals vacated the Governor's reversal. (*Id.* at
1414.) The Court compared Lee's crimes to crimes that the Governor
20 had properly found to be "atrocious," and found that Lee's crime
21 did not compare because Lee's acts in committing his crime did not
22 involve more than the minimum necessary to sustain his convictions.
(*Id.* at 1405.) The court explained:
23

24    The measure of atrociousness is not general notions of
common decency or social norms, for by that yardstick all
25    murders are atrocious. (See *In re Scott, supra,* 119

8

1    Cal.App.4th at p. 891, 15 Cal.Rptr.3d 32 [" '[A]ll second
     degree murders by definition involve some callousness-
2    i.e., lack of emotion or sympathy, emotional
     insensitivity, indifference to the feelings and suffering
3    of others' "].) Rather, the inquiry is whether among
     murders the one committed by Lee was particularly
4    heinous, atrocious or cruel. (In re Ramirez (2001) 94
5    Cal.App.4th 549, 570, 114 Cal.Rptr.2d 381, disapproved on
     another point by In re Dannenberg (2005) 34 Cal.4th 1061,
6    1082-1083, 1100, 23 Cal.Rptr.3d 417, 104 P.3d 783.)

7    (Id. at 1409.)

8         At first glance the facts in Lee seem quite similar to those
9    here.  However, there are differences.  First of all, Lee committed
     his crime over a longstanding business debt.  The target was
10   familiar with Lee and had refused to pay back a loan.  Here, the
11   target was unknown to Petitioner, and the motive is unclear.  It
12   appears to have been a foolish disagreement over nothing more
13   serious than some insults, a very trivial motive indeed.

14        Also, Lee was already armed when his target refused once again
     to pay the debt.  Petitioner actually had to go out of his way to
15   get his firearm after becoming angry in the bar.  He could have
16   just as easily left the scene and avoided the whole incident.  He
17   had no reason to see the victims again.  Instead he came back into
18   the bar and shot the targeted victim, causing him to fall to the
     ground.  He did not stop at this point, but continued shooting.  In
19   the course of shooting the target victim he hit a bystander not
20   once, but several times.  He placed everyone in the bar at risk
21   through his actions.

22        The facts of Lee are distinguishable from the facts in this
23   case.  In addition, the opinion in Lee has been criticized.  In
     People v. Jacobson (2007) 154 Cal.App.4th 849, the appellate court
24   disagreed with the Lee decision, as well as several other courts of
25

                                    9

1   appeal decisions. (*Id.* at 853.)  The court disagreed with them
2   because they "transmuted the *Rosenkrantz* standard into one that
3   permits the court to reweigh evidence, recalibrate relevant
4   factors, and reach an independent determination whether the inmate
    continues to pose a risk to public safety." (*Ibid.*)

5   **IV.   CONCLUSION**

6       Here, if the correct *Rosenkrantz* standard is applied the
7   Governor's reversal must be upheld, since there is some evidence to
8   support it.

9       Therefore, the petition for a writ of habeas corpus is DENIED.

10

11

12   _10/24/07_
13   Date                              Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _Jesus Lopez_ , declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

_Lopez, J_ , CDCR #: _D37180_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _Aw-201_
SOLEDAD, CA 93960-0689.

On _April 15, 2008_ , I served the attached:

EXHIBITS FOR PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS.

Bound, Submitted and Lodged Separately

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
P.O. BOX 36060
SAN FRANCISCO, CA 94102-9680

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _April 15, 2008_ .

_Jesus Lopez_
JESUS LOPEZ

Declarant